ARTHUR H. EPPLER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6403-69. Filed July 31, 1972.

*George Voss*, for the petitioner.
*Kenneth W. McWade*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies and additions to petitioner's Federal income tax as follows:

| Year | Amount | Addition to the tax under sec.— | |
| --- | --- | --- | --- |
| | | 6651(a) | 6653(a) |
| 1961 | $8,886.86 | $717.78 | $449.90 |
| 1962 | 21,331.35 | 4,493.17 | 1,066.57 |
| 1963 | 23,353.22 | 777.38 | 1,167.67 |
| 1964 | 21,399.31 | 809.94 | 1,069.96 |
| 1965 | 10,465.64 | _____ | 523.28 |

Concessions having been made, the only issue for decision is whether the activities engaged in by Eppler Institute for Cat Research, Inc., during the years in issue, constituted a trade or business within the meaning of section 162(a).[1]

FINDINGS OF FACT

Petitioner Arthur H. Eppler (hereinafter referred to as petitioner) was a legal resident of Milwaukee, Wis., at the time he filed his petition herein. He filed his Federal income tax returns for 1961, 1962, 1963, 1964, and 1965 with the district director of internal revenue, Milwaukee, Wis.

Petitioner, aged 70 at the time of trial of this case, was born and raised on a farm in Ixonia, Wis. Because of ill health during his childhood, he received formal education through only the sixth grade; however, he spent much time reading and taking correspondence courses in areas which interested him.

At about the age of 20, petitioner left the farm and went into the automotive-repair business, working on buses and farm machinery. Thereafter, he worked in airplane construction and in the heating and oil-burner business.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.

In about 1930, petitioner ceased oil-burner-servicing work and became involved in sandblast cleaning. On the basis of his experience with oil burners and furnaces, petitioner decided that boilers could be cleaned by using sandblasting machines. He obtained a dry sandblaster and started a furnace-and-boiler-cleaning business.

After using the dry sandblasting equipment for several years, petitioner developed, in about 1935, a wet sandblasting machine which used water mixed with the dry abrasives. He called this wet sandblasting process Vapor Blast. Throughout the last half of the 1930's, petitioner used his Vapor Blast machines for cleaning floors, cleaning newly cast metal, and a variety of other purposes. During this period, he continually made modifications of his machines and developed new techniques for their use.

In 1941, petitioner formed Vapor Blast Manufacturing Co. (hereinafter Vapor Blast). In the same year, petitioner granted to Vapor Blast an exclusive license in the United States to manufacture and sell an outside and open foundry wet sandblasting machine on which he had applied for a patent in 1940. The patent was granted in 1944. A second patent, involving a closed-type wet sandblasting machine, was granted in 1949. In exchange for certain patent rights, Vapor Blast agreed to pay petitioner royalties of 7½ percent of the retail list price of complete units, on all mechanically operated devices leased or sold, and $0.02 per pound of the compound chemicals covered by the patent, which were used or sold by Vapor Blast. During each of the years 1961 through 1965, petitioner reported as long-term capital gains, income pursuant to this agreement in the amounts of $43,949.72, $51,589.60, $50,367.10, $59,152.40, and $62,143.42, respectively.

During the 1940's, petitioner, through Vapor Blast, developed several new types of machines for cleaning metal and other materials. These various machines were used by automobile plants and, during World War II, military plants. In addition to designing these machines, petitioner developed new and varied forms of abrasives, including a liquid one, to be used in the cleaning process.

Around 1950, Vapor Blast moved into the factory building in Milwaukee where it is presently located. During the early 1950's, the factory suffered from a rodent problem. In an attempt to eradicate the rats, petitioner tried various poisons but discovered that they had no lasting effect. Finally, he acquired two cats from his mother who still lived on the farm in Ixonia. The cats and their progeny proved to be very effective in controlling the rodents.

As time passed, the cat population at the Vapor Blast factory multiplied. At first, the cats ran loose around the plant, but it became necessary, in the middle 1950's, to pen them. Petitioner converted one of

the old buildings on the factory premises into a facility for housing the animals. From time to time, petitioner experimented with numerous medicines and serums to treat diseases contracted by the cats. He also experimented with different kinds of cat litter and other cat maintenance items.

During the 1950's, Vapor Blast paid the expenses incurred in maintaining the cats. This included the costs of food, labor for feeding the cats and maintaining the premises, construction of cat hutches, and various other items. At the end of each year, these expenses were charged to petitioner and set off against his royalties from the patents held by Vapor Blast.

In the late 1950's, Vapor Blast decided to withdraw its financial support for various activities in which petitioner had been engaged. One such project was petitioner's work on an indirect-heat crop dryer which he had designed and was building. The research and design of this crop dryer, as well as certain products associated with it, were carried out by a division of Vapor Blast called the Farmotive Division. In approximately 1958, the Farmotive Division was dropped by Vapor Blast and reorganized by petitioner as the Farmotive Equipment Corp.

Vapor Blast had also financed the research and testing of other farm products designed by petitioner. This testing was carried out on the farm in Ixonia (hereinafter Hillcrest Farms or the farm). During this period, the farm was a limited partnership owned by petitioner, his mother, his sister, and a nephew. A large number of petitioner's cats were moved to the farm at some point during this period, and facilities were constructed for maintaining them. At the time Vapor Blast was concerned about its capital in the late 1950's, it dropped its financing of the testing activities carried out at Hillcrest Farms.

Vapor Blast also wished to cease providing the funds necessary to keep and raise the cats located at the plant. Consequently, in late 1959, petitioner organized and incorporated Eppler Institute for Cat Research, Inc. (hereinafter referred to as Eppler Institute or, sometimes, the institute), to take over all activities relating to the cats. The articles of incorporation executed at the time of incorporation provide that the purposes of Eppler Institute were to develop and maintain laboratory and research facilities for researching and testing the health of cats; to provide reports and research results regarding the tests done on the cats; to publish reports and otherwise provide information to public and private parties regarding the research and experiments carried out in the laboratory facilities; and to buy, sell, promote, and otherwise deal with patents, trademarks, or products created or derived from the carrying out of the research purposes.

At or about the same time in 1959, petitioner incorporated Justrite Small Animal Hospital Supplies Corp. (hereinafter Justrite), owning 100 percent of its stock. Originally, this corporation was to sell and distribute products associated with cats; however, when no such products developed, the corporation was dissolved in 1964.

On January 2, 1960, petitioner invested the minimal requirement of $500 in Eppler Institute. Subsequently, additional investments were made, and capital stock in the amount of $10,000 was issued. On January 29, 1960, Eppler Institute elected to be taxed as a small business corporation (also referred to herein as a subchapter S corporation). Petitioner owned 100 percent of the stock of the institute.

After the creation of Eppler Institute, the cat population grew considerably, reaching approximately 450 at one point during the years in issue. Eppler Institute maintained the animals in two catteries: one (Urban Cattery A) was located in buildings on the property of Vapor Blast; the other (Farm Cattery B) was located at Hillcrest Farms.

In the mid-1960's, petitioner consulted with Lawrence Wheeler (hereinafter Wheeler), the patent attorney who had handled petitioner's patents for the Vapor Blast equipment, concerning the possibility of obtaining a patent on a breed of cats. Wheeler informed petitioner that he did not believe this was possible. During the years in issue, no patents or trademarks were secured by Eppler Institute for a breed of cats or for any products relating to the cats.

During the years in issue, petitioner experimented with corncobs as a base for litter in the cat cages. At or about this time, a mechanical cornpicker-sheller which left the corncobs in the fields came into widespread use in the area of petitioner's residence. As a result, the available supply of corncobs for industrial use was greatly reduced.

Petitioner purchased many different medicines for use in treating diseases contracted by the cats, and he consulted with veterinarians on numerous occasions concerning the health of his cats. He also experimented with different types of flea-control formulae in order to rid the cats of their fleas, and developed different types of cages to house the cats.

Although petitioner engaged in this experimentation, he kept no formal records of his activities and he maintained no breeding schedules or lists of drugs which he used. Neither petitioner nor Eppler Institute had a license for the production of any medication for use on cats. Eppler Institute employed no veterinarians or trained researchers, and petitioner had no formal training in veterinary or research with respect to animals. Eppler Institute made no sales of any products and made no effort to sell any products or services during the years in issue.

During the years 1960 through 1965, Eppler Institute had no gross receipts of any kind from the sale of any products or services involving the cats. The only gross receipts which it reported on its Federal income tax returns were obtained from reimbursements from Vapor Blast for expenses paid for watchman service and for general maintenance performed on Vapor Blast property by mutual employees of Vapor Blast and Eppler Institute. During these same years, no receipts were generated by the activities carried on by Eppler Institute.

Petitioner filed Federal income tax returns for Eppler Institute for the years in issue with the district director of internal revenue, Milwaukee, Wis. On those returns, Eppler Institute reported the following operating losses and gross receipts in the form of reimbursements from Vapor Blast:

| Year | Operating losses | Reimbursements from Vapor Blast |
|---|---|---|
| 1961 | $33, 800. 10 | $9, 000. 00 |
| 1962 | 41, 273. 72 | 6, 314. 35 |
| 1963 | 40, 037. 89 | 5, 482. 52 |
| 1964 | 33, 538. 00 | 5, 576. 89 |
| 1965 | 26, 912. 21 | 8, 396. 11 |

On his Federal income tax returns for the years in issue, petitioner, as the sole shareholder of Eppler Institute, claimed deductions for net operating losses of Eppler Institute as follows:

| Year | Amount |
|---|---|
| 1961 | $25, 000. 00 |
| 1962 | 25, 000. 00 |
| 1963 | 34, 261. 42 |
| 1964 | 25, 000. 00 |
| 1965 | 26, 912. 21 |

Respondent, in his notice of deficiency, determined that the expenses attributable to the activities of Eppler Institute for 1961 through 1965 were not ordinary and necessary expenses incurred in a trade or business. Consequently, he disallowed petitioner's claimed losses as follows:

| Year | Amount |
|---|---|
| 1961 | $24, 831. 77 |
| 1962 | 24, 786. 96 |
| 1963 | 33, 759. 11 |
| 1964 | 24, 452. 73 |
| 1965 | 26, 794. 27 |

ULTIMATE FINDING OF FACT

The activities engaged in by Eppler Institute during the years in issue did not constitute a trade or business within the meaning of section 162(a), and none of the expenses claimed as deductions on Eppler

Institute's income tax returns for those years were paid or incurred in carrying on a trade or business.

OPINION

Petitioner claims deductions for the losses reported by Eppler Institute. Section 1374 allows a shareholder of a subchapter S corporation a deduction for his proportionate share of the corporation's net operating losses to the extent of his adjusted basis in his stock and in any indebtedness of the corporation to him. Not all of the corporation's losses are deductible by the shareholder, however; only those losses arising from expenditures which meet the requirements of section 162(a)[2] are properly allowable as deductions.

The question with which we are presented is whether the expenditures incurred by Eppler Institute in maintaining and caring for the cats located on the premises of Vapor Blast and Hillcrest Farms were paid or incurred in a "trade or business" within the meaning of section 162(a). These deceptively simple words, "trade or business," have produced floods of litigation, and from the decided cases has been distilled the rule that expenditures are incurred in a "trade or business" only if they are prompted by a bona fide profit motive. *Margit Sigray Bessenyey*, 45 T.C. 261, 273–274 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967); *Lamont* v. *Commissioner*, 339 F. 2d 377, 380 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court.

In carrying on an activity which purports to be a trade or business, it is recognized that an individual may have mixed motives. A court will not substitute its judgment for that of the taxpayer as to the prospective financial success of an undertaking but will limit its inquiry to ascertaining why the taxpayer incurred the disputed expenses. For the activity to qualify as a trade or business under section 162(a), a profit motive must be dominant. As stated in *Hirsch* v. *Commissioner*, 315 F. 2d 731, 736 (C.A. 9, 1963):

From the very import of Section * * * [162], * * *, it is clear that Congress intended that the profit or income motive must first be present in and dominate any taxpayer's "trade or business" before deductions may be taken. While the expectation of the taxpayer need not be reasonable, and immediate profit from the business is not necessary, nevertheless, the basic and dominant intent behind the taxpayer's activities, out of which the claimed expenses or debts were incurred, must be ultimately to make a profit or income from those very same activities. * * * [Citations omitted.] Absent that basic and dominant motive, the taxpayer's activities, no matter how intensive, extensive or expensive, have not

---

[2] Sec. 162(a) provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."

been construed by the Courts as carrying on a trade or business within the purview of Section * * * [162]. * * * [Citations omitted.]

Moreover, it is not sufficient to show the possibility of a profit for some period in the indefinite future. In *Margit Sigray Bessenyey*, *supra* at 274, this Court said:

the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.

To answer the question posed in the application of section 162(a) requires, of necessity, consideration of all the facts and circumstances of the case. *Morton* v. *Commissioner*, 174 F. 2d 302, 303 (C.A. 2, 1949), affirming a Memorandum Opinion of this Court.

Petitioner's legal theory is that all of his business activities—his dry sandblasting activities, his several wet sandblasting inventions, his crop-dryer project, etc.—have involved experimentation and research. He asserts that, because of his lack of formal education, he has been compelled to use a trial-and-error method in perfecting his discoveries and, consequently, it has taken him longer to generate profits than might otherwise be true. He further claims that he intends and expects ultimately to realize a profit from Eppler Institute's activities in connection with the cats in the same manner as he has from his other endeavors.

We do not think the activities of Eppler Institute are similar to the activities of petitioner in connection with his various businesses. Petitioner handled his business endeavors in connection with his Vapor Blast inventions, for example, in an entirely different manner from the activities of Eppler Institute. At all times in connection with Vapor Blast, he was engaged in a business venture which was producing income. While he may have experimented with various kinds of machinery and equipment, his experimentation was directed toward a defined objective which, when accomplished, would produce income.

In contrast, even though more than 10 years have passed since Eppler Institute was organized, we search the record in vain for any specific, concrete evidence as to how the huge expenditures which petitioner seeks to deduct could ever result in the realization of any income, let alone income comparable to the expenditures which he has incurred on the cats.

Moreover, the large unabated expenditures, the absence even at this late date of any concrete business plans, the manner in which the institute conducted its affairs, and the results of its activities are wholly inconsistent with the operation of a business for profit.

Eppler Institute's costs of maintaining the huge herd of cats have been enormous, amounting to over $175,000 during the 5 years in

controversy. This amount does not include any of the expenditures before or after the years before the Court. Such a long record of heavy expenditures without any real effort to curtail them or any offsetting revenues indicates that the activity was not conducted as a profit-motivated business. *Henry P. White*, 23 T.C. 90, 94 (1954), affirmed per curiam 227 F.2d 779 (C.A. 6, 1955), certiorari denied 351 U.S. 939 (1956). "It would be specious to say that a vain hope that on some remote day a profit may result is enough to give the operation * * * the character of trade or business." *Louise Cheney*, 22 B.T.A. 672, 674 (1931).

Notwithstanding these huge outlays of funds, the stark fact is that not one cent of income has been generated from the ownership and maintenance of the cats. The institute's only "income" was reimbursement for certain expenses which it paid on behalf of Vapor Blast. When petitioner brought the first two cats from his mother's farm in about 1950, they served the useful purpose of controlling the rats at the Vapor Blast factory. As the cats multiplied, however, it became necessary to pen them in buildings located on the factory grounds and at Hillcrest Farms. During the years in controversy, the cats were not for sale; they were not used for the production of any marketable product; and they could not be established as a breed. In short, they served no useful purpose as far as we can discern from the evidence.

Petitioner and Wheeler, the patent attorney who has represented petitioner in his Vapor Blast and other business ventures, testified concerning various projects which they have talked about as possible sources of revenue at some future date. However, they were unable even to the date of the trial to articulate any concrete way in which these expenditures for the care of the cats were necessary to those projects or how they will ever produce a profit.

It is true that the institute's articles of incorporation state that research was to be done and data was to be collected and made available to public and private parties. However, no formal records with respect to the cats were ever kept, and no schedules were maintained. Petitioner administered to the cats some patent drugs and, occasionally, some prescription ones, and observed their effects on the animals. However, no charts or other records were kept of the results. If the institute had been engaged in the business of research and the development of cat-related products, maintenance of records of the experiments and tests would obviously be needed. Petitioner may have a fantastic memory, as he would have us believe, but it goes beyond credibility to suggest that his memory would substitute for some kind of formal records if the institute actually intended to publish reports or produce cat-related products.

The articles of incorporation also state that the institute was organized to engage in the development of products for the health and care of cats, and there is testimony suggesting that development of some kind of serum was among the institute's objectives. Yet no veterinarians or research analysts were ever employed to assist in any such activity. The record shows that petitioner occasionally consulted with veterinarians, but no evidence was presented to show they actually assisted him in any constructive work. Indeed, petitioner admitted that neither he nor the institute was in the drug business, neither possessed a drug license, and neither had ever applied for one.

Many of the activities which petitioner cites to support his thesis that the institute was engaged in a profit-oriented business are the activities in which any owner of pets must engage—housing, feeding, cleaning, and observing the animals. Almost any such owner experiments with litter, housing facilities, medications, and flea powder. That petitioner had as many as 450 cats gave his experiments greater magnitude than those of the ordinary pet owner, but the magnitude of his operations does not show that they constituted a trade or business. Regardless of "how intensive, extensive or expensive" his operations were, they were not a trade or business because they were not profit motivated. *Hirsch* v. *Commissioner, supra* at 736.

We are compelled to conclude in the light of the facts of record—including the absence of any income over such a long period, the magnitude and nature of the expenses, the manner in which the activities were conducted, the lack of any definite potentially profitable objective, and the remoteness of any conceivable future profits—that the activities engaged in by Eppler Institute during 1961 through 1965 did not constitute a "trade or business" within the meaning of section 162(a). Therefore, petitioner is not entitled to deduct the institute's operating losses for those years.[3]

*Decision will be entered under Rule 50.*

---

[3] According to petitioner's reply brief, the additions to tax under secs. 6651(a) and 6653(a) are conceded by petitioner.