THOMAS E. BARBOUR and CORA B. BARBOUR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barbour v. Commissioner
Docket No. 5204-73.
United States Tax Court
T.C. Memo 1976-85; 1976 Tax Ct. Memo LEXIS 318; 35 T.C.M. (CCH) 360; T.C.M. (RIA) 760085; March 18, 1976, Filed John R. McInnis and Sherman V. Lohn, for the petitioners. C. Garold Sims, for the respondent. *319 WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income taxes of $21,130.60 for 1967, $16,895.09 for 1968, $8,767.56 for 1969, and $3,710.57 for 1970. Respondent has conceded that there is no deficiency for 1970. The sole issue is whether petitioners intended to make a profit in operating their cattle ranch. If they did not so intend, then they may not deduct under section 165 [1] the losses from cattle ranching which occurred during the years in issue. FINDINGS OF FACT Some facts were stipulated and are found accordingly. Thomas E. Barbour and his wife, Cora, lived at Monture Ranch, Ovando, Montana, when they timely filed their 1967, 1968, and 1969 income tax returns at the Western Service Center, Internal Revenue Service, Odgen, Utah, and when they filed their petition in this case. Their income tax returns were prepared using the cash receipts and disbursements method of accounting. Petitioners have owned Monture Ranch since 1941. They lived exclusively at Monture Ranch from 1945 to the time of *320 trial. From 1941 through 1945, while Thomas E. Barbour was serving in the armed forces, Cora B. Barbour lived at Monture Ranch. Monture Ranch is one of the larger ranches in the Ovando area. It is compact since all the land is continguous and has good fields, grass, and water on which to operate a commercial cattle ranch. The trees on the ranch have economic and aesthetic value. Petitioners executed a partnership agreement on January 1, 1955, which provided in part as follows: (2) NAME. The name of this partnership shall be "MONTURE RANCH." (3) TERM. This partnership shall take effect as of the opening of the first day of January, 1955, and shall continue thereafter in existence until terminated and dissolved by mutual agreement of the parties hereto, or by operation of law. * * *
(5) DISTRIBUTIONS AND WITHDRAWALS. It is agreed that the partnership property and business have been in a stage of constant development and improvement since acquisition, and that the partnership is about at the stage of substantial profitable operation, providing economic conditions do not become seriously adverse. Since Thomas E. Barbour devotes all his personal time and effort to the partnership *321 operations without salary, and the contributions by Cora B. Barbour have been primarily in the form of capital, the parties agree to reconcile the disproportion in their services to the partnership hereafter by establishing and putting into effect for the years 1955, 1956 and 1957 the following plan: (a) If the partnership earns a profit, the same shall be divided two-thirds (2/3) to Thomas E. Barbour and one-third (1/3) to Cora B. Barbour. (b) If the partnership sustains a loss, the same shall be borne solely by Cora B. Barbour. (c) The capital shares of the parties in the partnership shall remain equal. A supplemental partnership agreement extended the partnership division of profit and loss beyond 1957 through the time of trial. From 1964 through 1973, the partnership incurred the following ordinary income or loss and capital gain or loss: Year
Income or Losses
Capital Gain or Loss [2]
1964
[26,108.13)
[ 2,376.79)
1965
(29,495.21)
( 728.97)
1966
( 4,427.98)
1,582.54
1967
(45,950.83)
( 239.86)
1968
(36,130.79)
( 1,161.56)
1969
(31,064.27)
0
1970
(12,372.36)
( 1,175.01)
1971
( 6,809.38)
34,705.03
1972
(18,307.77)
254.30
1973
7,162.53
3,415.22
*322 Petitioners from 1967 through 1969 earned the following dividends, taxable interest, capital gains, and income exempt from Federal Taxation: Capital
Tax Exempt Year
Dividends
Interest
Gain (Loss) [3]
Income
1967
$107,307 $0
$ 28,830
$ 42,305
1968
98,080
367
1,292
44,667
1969
111,567
293
441,551
42,703
During the years in issue, expenses from the operation of Monture Ranch exceeded receipts. From 1945 through 1969, petitioners devoted all of their time to ranching, with the exception of two-week annual vacations. The work petitioners performed throughout the years was very arduous. Weather conditions at Monture Ranch were severe. Consequently, Thomas E. Barbour fed hay to the cattle raised there from Thanksgiving until May, sometimes twice per day. During winter storms, he plowed out roads leading to haystacks and broke up ice so that the cattle could drink. He performed this work himself during the years in issue although he had arthritis. Cora Barbour had bronchial asthma. *323 Thomas Barbour lived in western Montana and worked on a ranch for approximately four years before he and his wife acquired Monture Ranch. They chose the Ovando, Montana area because of his previous experience and his belief that because of abundant water it was a fine area to raise cattle. During the years in issue, Monture Ranch was comprised of approximately 3,584 acres. The acreage was purchased in the following increments: Date of
Amount of
Purchase Acquisition
Acreage Acquired
Price
1941
560
$ 5,700.00
1942
160
800.00
1943
400
2,800.00
1946
1,074
29,000.00
1958
160
4,800.00
1965
1,194
75,000.00 In addition the partnership leased an additional 940 acres of pasture land during the years in issue. The buildings, fences, irrigation facilities, and hay meadows located on the tract acquired in 1941 were all in bad condition at that time. The irrigation facilities and buildings located on the tract acquired in 1943 were also in bad condition when it was acquired. Cora Barbour purchased the tract acquired in 1942, which was pasture land, while Thomas Barbour was in military service. In operating the ranch from 1942 to 1945, Cora Barbour *324 bought and sold cattle, raised chickens, calves, and sheep, and milked cows. She purchased the cattle at Drummond, some 40 miles from Monture Ranch, and trailed them in from Drummond. From 1941 through 1945, the irrigation ditches were cleaned out or resurveyed and reworked and portions of the land were plowed up and reseeded. The land acquired in 1946, consisting of 1,074 acres, included certain buildings which were still in use at the time of trial and an irrigation system which, due to disrepair, was unable to service the best meadow thereon. Subsequently, Thomas Barbour replaced a flume with a siphon pipe which enabled petitioners to irrigate the western third of this tract. In addition Thomas Barbour plowed up the nonirrigable land and reseeded it to dry land hay. In 1951 or 1952, petitioners requested a soil conservation service to study their operation including land usage, drainage of wet meadows, and irrigation facilities. Because of recommendations based on this study, petitioners leased additional land to relieve overgrazing of pastures and expanded their ditch system. In the cattle industry, the term "commercial cows" refers to animals whose offspring are sold for *325 beef, while the offspring of "registered cows" are primarily held or sold for use as breeding stock. The poorest quality offspring from a registered herd are sold for beef, the same as commercial cows. In western Montana, commercial cattle are sold either by private sale to a buyer who comes to the ranch or at public auctions which are held weekly in different towns. Registered cattle are primarily sold at highly advertised auction sales, held only at limited intervals. Monture Ranch handled the following type of cattle from 1941 through 1970: Year
Type
1941 to 1951
Commercial herd
1951 to 1958
Commercial herd
1958 to 1962
Commercial herd; registered herd
initiated
1962 to 1965
Primarily registered herd
1966 to 1970
Primarily commercial herd
In the commercial cattle industry, animals from a uniform herd bring a higher price than animals from a nonuniform herd. In 1957, Thomas Barbour determined that Monture Ranch's herd was not sufficiently uniform because it had been using bulls purchased from different places. In order to raise its own bulls and thereby produce a more uniform and profitable herd, Monture Ranch began acquiring a group of registered *326 cows in 1957. In 1958, petitioners acquired an additional 160 acres of pasture and bought a fine quality registered bull to breed with their registered cows, which then numbered thirty-two. From 1958 to 1962, petitioners sold the offspring of registered cows at sales around the state and at private sales at the ranch. A selection of calves, which will eventually be sold at public sales, is made approximately one year prior to sale. The calves are fed every day; their hair is brushed; they are quartered from weather. About a week before showing the cattle, work becomes more pronounced: it is necessary to wash the cattle, get the final hair coat into shape, trim their feet, and monitor their diets. Then it is necessary to take the cattle to the show and care for them there. From 1960 through 1962, the animals raised and exhibited by Monture Ranch received multiple awards at various exhibitions in Montana and Washington. Petitioners alone performed the labor involved in preparing them for these shows. Petitioners, with the occasional help of a neighbor, also took the animals to the exhibitions. By 1962, Monture Ranch's registered herd had expanded to approximately 100 cows. Petitioners *327 realized that they did not have enough land to maintain both registered and commercial herds. They felt that they were doing well with the expanding registered herd and that they could make more money by raising registered herds exclusively. Accordingly, Monture Ranch sold its commercial herd in 1962. From 1962 to 1966, Monture Ranch maintained a herd of approximately 120 registered cows and continued to sell animals at livestock shows and by private sale. From 1962 to 1965, its animals received awards at Montana exhibitions. The herd was restricted to its size of 120 because of Thomas Barbour's belief that different segments of a registered herd should be separated by at least two fences. He believed that a breeder of registered animals must be prepared to guarantee the identity of the specific bull to which each cow had been bred. Petitioners acquired an additional tract of 1,194 acres in 1965 because it was adjacent to Monture Ranch, was irrigated from the same ditch, and presented the opportunity to raise more cattle and make more money. At the time of acquisition, the irrigation ditches, meadows, and grass were in poor shape, but the land itself was in good shape. Petitioners *328 decided that they could profit more quickly and easily with a commercial herd of larger proportions now that they had more land. The registered cattle industry was becoming depressed because there were more registered bulls raised in Montana than needed for the number of cows. In 1966, petitioners accordingly switched from a primarily registered herd to a primarily commercial herd. The entire herd of registered females, except for 36 of the best heifers, was sold in 1966. The heifers were kept to raise bulls and thereby increase uniformity of the commercial herd and supplement ranch income. The normal time for a cow to bear a calf ("calving") is in the spring of the year. However, in the mid and late 1960's, many cattle industry publications encouraged fall calving so that the calves would be more healthy. Prior to 1966, Monture Ranch had favorable results with registered cows on a fall calving program. The partnership decided to acquire a group of uniform females which could be put on a fall calving program. The decision to engage in fall calving was thus reasonably based on industry publications, independent investigation of that concept, and the prior favorable experience with *329 registered animals. The partnership decided that the commercial breeding stock to be acquired had to be uniform, high quality, and disease-free, since this would produce the greatest profit. These objectives were economically sound. To achieve uniformity, the partnership decided to buy all females from one herd. The herd selected, that of breeder Joe Soulsby, had sufficient numbers to meet the partnership's needs and had a reputation for high quality and high sales returns. In their course of dealing, Mr. Soulsby assured Thomas Barbour that the decision to engage in fall calving was well-advised. Accordingly, in 1966 the partnership purchased from Mr. Soulsby his entire herd of 100 yearling heifers (born in 1965 and hereinafter called "1965 cows") and 125 heifer calves (hereinafter called "1966 cows"). In 1967, the partnership purchased an additional 120 calves from the Soulsby herd (hereinafter called "1967 cows"). Out of the entire herd of 345 females purchased from Mr. Soulsby, only those born in 1965, approximately a third of the total, were mature enough to bear calves in the fall of 1967. Accordingly, in that year, only 79 commercial calves and 29 registered calves were raised *330 on the ranch. Since calves born in the fall of 1967 were not marketable in that year, the partnership was able to sell only three calves, in addition to a few other animals. In 1968, both the 1965 and 1966 cows, approximately two-thirds of the total commercial cows, were of producing age, while the other third, the 1967 cows, were still too young. In that year many of the 1965 cows and 1966 cows did not bear calves (referred to as "open"); only 183 commercial calves and 31 registered calves were born on the ranch. Thomas Barbour then began to doubt the advisability of the fall calving program because he attributed the problem of open cows to the unnatural breeding season. In 1968, partnership income from cattle was limited to proceeds from selling a few adult cattle and 69 of the 108 calves born in 1967. Again the calves born in the fall of 1968 were retained for sale in the subsequent year. Of the 183 commercial and 31 registered cows born in the fall of 1968, fifteen calves died during the winter and another fourteen became too sick to sell in the summer of 1969. This loss was due to pneumonia caused by a sudden change in climate from 40degree below zero to rain and then back *331 to cold conditions. The year 1969 was the first year in which all original Soulsby cows were of producing age. A large number of them were again open due to the fall calving program, and only 263 commercial calves were born. In 1969, partnership income from cattle was limited to proceeds from selling some adult cattle and 167 of the calves born in 1968. The 1969 calves were kept for sale in 1970. The year 1970 was the first year in which calves from the entire herd were sold, since 1969 was the first year in which the entire herd was of producing age. In that year the partnership sold 233 calves, of which 89 were the offspring of two-year old heifers (the 1967 cows). The calf from a two-year old heifer is not as valuable as the calf from an older cow. In 1971, petitioners decided to change to a spring calving program for two principal reasons. First, they determined that the fall calving program was losing money and that a profit could be achieved with spring calving. Second, fall calving required them to be present at the Monture Ranch during the winter months, but Cora Barbour's physician had ordered her to live elsewhere during the winter. Since the cows which were to bear *332 calves in the fall of 1971 could not be changed to a spring calving program, such cows were sold in 1971 prior to the fall calving season. The Monture Ranch partnership received the following prices per 100 pounds of live weight during various years: Year
Steer Calves
Heifer Calves
1958
$35.60
$32.50
1968
27.60
25.20
1969
37.40
33.00
1971
39.60
35.75
1973
60.34
53.50 During years prior to 1970, Thomas Barbour expected the price of beef to increase with the rest of the economy. His expectation was not realized until 1973, when prices increased to where he thought they should be. Comparing 1958 with 1967 through 1969, Monture Ranch increased in size by approximately 50 percent (from 2,354 acres to 3,548 acres), and its herd increased by more than 50 percent (from approximately 190 cows to approximately 345 cows in 1968 and 1969). Despite this increase in size and animals held, Monture Ranch's costs increased by only 50 percent, from an average of $37,570 in 1957 and 1958 to an average of $56,324 from 1967 to 1969. During the years in issue, petitioners tried but were unable to hire competent employees. Consequently, they experienced a high degree *333 of turnover and labor inefficiency. The total number of persons employed, the total number of months employed, and the total compensation paid for those years was as follows: Total
Total Months
Total Year
Employees
Employed
Compensation
1967
10
36
$10,753.81
1968
13
43 1/2
10,085.69
1969
19
36
12,857.39
Petitioners' residence was a frame-type house containing four bedrooms. No depreciation or expenses attributable to it were claimed as costs of operating the farm. Their ranch contained no entertainment facilities, guest cabins, or swimming pools. All other buildings located on petitioners' ranch were used for purposes germane to its operation and had a wholly functional appearance. Some of these buildings were built by Thomas Barbour or with his help, and others were either moved in from the tracts of land purchased in the 1940's or were constructed from materials taken from old buildings which were dismantled. Thomas Barbour and the employees of the ranch performed much of the health care of the cattle, as well as repair and maintenance of machinery. To this end, the ranch had its own machine shop, corrals, a chute used to administer *334 shots and other medical attention, and a cattle table used to trim the animals' feet. Starting in 1958, when Monture Ranch acquired its first registered cow, Thomas Barbour maintained a record referred to as a "herd book," in which he made an entry for each registered calf born on the ranch, showing its date of birth, sex, and the identity of its dam and sire. An indelible tatoo number was stamped into the ear of each calf, and this number was used to identify the calf in the herd book. By filing certain forms with the American Hereford Association for every registered animal it owned, the partnership received and maintained a record showing the name, sex, registry number, tatoo number, and date of birth of each registered animal, together with the identity of its ancestors for three generations back. The partnership maintained a separate record for each registered cow in its herd showing the name, registration number, date of birth, sex, sire, and ultimate disposition made of each calf born to such cow. Starting with 1966 and 1967, when the partnership acquired the commercial female breeding animals from the Soulsby ranch, Thomas Barbour continued to maintain inventory and production *335 records which contained the type of detailed information prescribed by the American Hereford Association for use by registered cattle breeders, together with additional data which would be useful in deciding which cows to cull out and sell in order to improve the overall quality of the herd. Each of the more than 300 commercial cows was given an ear tag with an identification number. By placing an ear tag in each calf and using a herd book which he always carried with him, Thomas Barbour kept an inventory and production record with respect to each commercial cow showing the identification number, sex, and date of birth of each calf born to her while owned by the ranch. This record also disclosed information pertaining to the cow's health history, any unusual trouble she encountered in bearing a calf, and any unusual good or bad qualities possessed by her offspring. During the years in issue, in addition to maintaining the cow production records, Thomas Barbour also maintained separate calf records, disclosing the identification number, sex, and dam of each calf. During 1968 and 1969, the calves were weighed when approximately nine months old, and these weights were listed in the *336 calf records. These records also contained information on any unusual qualities, good or bad, that the calves might have. The cow and calf records which petitioners maintained were designed to produce the right decisions concerning cows which should be culled out and sold to improve the herd. In addition to maintaining complete records with respect to cows and calves, Thomas Barbour also kept a record of bulls which the partnership owned, which disclosed their date of birth and weight at various intervals. The purpose of this was to allow petitioners to evaluate their feeding program and the productivity of each bull. From 1950, petitioners maintained for each year a cash receipts account. The account shows the date of receipt, whether it was deposited to the partnership bank account or, if not, to cash on hand, and the source of the receipt. From 1956 to 1965, these accounts were not totaled. Of the remaining years, five were partially totaled. During the same period, petitioners maintained a cash and check disbursements journal for each month and each year which disclosed the date, amount, and nature of each disbursement. Also, petitioners maintained a record of all equipment *337 which the partnership acquired, which discloses date of acquisition, cost, and complete history of depreciation. Starting in 1946, Thomas Barbour maintained a diary which now contains approximately 175 pages of information pertaining to the operation of the Monture Ranch, including weather, haying operation, disease problems, breeding dates, sales and prices of animals, animal inventories, and numerous other factors. During their years on the Monture Ranch, petitioners indicated a desire to participate in programs designed to improve the production and economic return from cattle ranching. Thus, they participated in the Montana Beef Performance Association as well as the Carcass Evaluation Program and the Total Performance Records program sponsored by the American Hereford Association. These programs resulted in some bad experiences and were abandoned. Thomas Barbour acknowledged to an Internal Revenue Agent that Monture Ranch was a good place to raise children and that the place [referring to Monture Ranch] was making him money just sitting there. At trial, he acknowledged his living conditions were good. ULTIMATE FINDING OF FACT Petitioners intended to profit in operating *338 their cattle ranch. OPINION During the years in question, expenses from the operation of Monture Ranch exceeded receipts. We must decide whether these expenses are allowable under section 162. [4] If they are, then petitioners may deduct the resulting net losses from their income from other sources under section 165. [5]
*339 Respondent does not dispute the amount of the expenses nor that they were "ordinary and necessary." Furthermore, assuming a profit motive, raising cattle is clearly a "trade or business" within the meaning of section 162. Mercer v. Commissioner,376 F. 2d 708 (9th Cir. 1967). Thus, the only issue is whether petitioners intended to make a profit from their cattle ranch. [6]
Whether petitioners intended to profit is a question of fact to be determined from the entire record. Morton v. Commissioner,174 F. 2d 302 (2d Cir. 1949), affg. a Memorandum Opinion of this Court, cert. denied 338 U.S. 828 (1949). We will treat each factor we have *340 deemed significant in turn. Cattle ranching was a full-time activity for petitioners. From 1945 to 1969, they devoted all their time to ranching activities, with the exception of two-week annual vacations. Furthermore, they were not absentee ranchers. From 1941, when they purchased the nucleus of the ranch, through 1945, Thomas Barbour was in military service; Cora Barbour, however, lived at the ranch. From 1945 to the time of trial, they both lived exclusively at Monture Ranch. In addition, both worked hard on the ranch. Thomas Barbour fed hay to the cattle from Thanksgiving to May, often twice per day. During winter storms, he plowed out the roads leading to the haystacks and broke up ice so that the cattle could drink. He performed this work although he had arthrities. Thomas Barbour also did much of the work involving health care of the cattle, as for example, administering them shots and trimming their feet. There are numerous other examples which we need not list. Admittedly, "[the] spending of time, money and effort * * * in any activity or venture in the general realm of business * * * does not per se put a taxpayer in 'business' within Section 23 [now section 162]." *341 Hirsch v. Commissioner,315 F. 2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. However, Hirsch, also states at page 737 that "each case must be decided upon its own particular facts." Accordingly, while petitioners' efforts, outlined above, are not dispositive of the issue before this Court, they are certainly a factor in petitioners' favor. Respondent contends that petitioners wanted to establish a country estate, but the ranch was certainly not a "country estate" in the conventional sense of the word. It contained no entertainment facilities, guest cabins, or swimming pools. The buildings on the ranch were used for purposes germane to its operation and had a wholly functional appearance. Kansas Savings & Trust Co.,2 B.T.A. 1253 (1925). We do not think Monture Ranch was a "country estate," but a functioning cattle ranch. Throughout many of the years since 1941 and for all the years in issue, petitioners kept extensive records. We will emphasize only those records they kept for the years in issue in which they had primarily commercial herds. There were records on the cows, which contained information on the cows' health *342 and any trouble individual cows had in bearing calves. This information was useful in deciding which cows to cull out and sell in order to improve the herd. There were also separate calf and bull records. The calf records showed their weight at nine months and any unusual qualities, good or bad, that the calves might have. The bull records allowed petitioners to evaluate their feeding program and the productivity of each bull. We think all of these records, whether on cows, calves, or bulls, provided the type of information that was necessary if informed business decisions were to be made. Petitioners' extensive cattle records are thus another factor indicating that they intended to make a profit. Marshall Field,26 B.T.A. 116 (1932), affd. 67 F. 2d 876 (2d Cir. 1933). Petitioners also maintained a cash receipts account, a cash and check disbursements journal, and a record disclosing information useful in determining depreciation. Like the cattle records, we think these records are those of businessmen intent on a profit, not those of mere hobbyists. Respondent emphasizes that Monture Ranch was operated at a loss for a long period of time. The length *343 of the period of losses is certainly a factor that must be weighed in deciding whether petitioners intended to make a profit. Henry P. White,23 T.C. 90, 94-95 (1954), affd. 227 F. 2d 779 (6th Cir. 1955). In this case, however, there is a valid explanation for the losses besides indifference to profits. External forces, beyond petitioners' control, caused the losses. James Otis,7 B.T.A. 882 (1927); H. T. Cochran,3 B.T.A. 215 (1925). From 1962 through 1965, petitioners had a primarily registered herd. Unfortunately, at the end of that period, the registered cattle industry became depressed since there were more registered bulls raised in Montana than needed for the number of cows. From 1967 through 1969, the years in issue, petitioners had a primarily commercial herd. Three factors hindered profits. The fall calving program proved disastrous despite industry publications to the contrary. Furthermore, petitioners did not have a fully mature herd; some cows were not of calf-bearing age until 1970. Finally, the price of beef that petitioners received in 1958 was higher than that received in 1968. It was not markedly different *344 from that received in 1969. Perhaps year after year of losses would have deterred others from continuing. But it is clear that in the Ninth Circuit, "a taxpayer's venture is a trade or business if he has a good faith expectation of profit from that venture, irrespective of whether or not others might view that expectation as reasonable." Mercer v. Commissioner, supra at 711. We also think that petitioners' readiness to experiment with registered cattle and the fall calving program and to abandon these endeavors when they proved unsound indicates a desire to make a profit on Monture Ranch. Thomas F. Sheridan,4 B.T.A. 1299 (1926). Respondent is correct when he argues that petitioners' outside income is a factor which we must weigh. Schley v. Commissioner,375 F. 2d 747 (2d Cir. 1967), affg. a Memorandum Opinion of this Court. He contends that because of their wealth, petitioners were indifferent to profit. We think the record amply shows that, despite their outside income, petitioners wanted to succeed financially as cattle ranchers. Respondent also alleges that petitioners took no affirmative action to reduce their expenses. *345 Admittedly, petitioners' expenses have increased over the years, but so have expenses in other elements of our society. The question is really whether petitioners' expenses, particularly their labor costs, have risen inordinately in relation to other ranches in the area. Unfortunately, respondent has not presented us with enough competent evidence to determine the answer to this question. [7]
Respondent also contends that petitioners evidenced no plan of development. This contention merits little consideration. Petitioners have been developing their ranch for 30 years, improving irrigation ditches, seeding portions of the ranch, and raising either commercial or registered cattle depending on market conditions. Respondent also contends that petitioners never projected when Monture Ranch would produce a profit. Arthur H. Eppler,58 T.C. 691 (1972). *346 He argues that while petitioners maintained quality control records, there was no evidence that any data were maintained with regard to sales of animals. This is simply not true, as we have before us the price per hundred pounds of animal weight for the years 1958, 1968, 1969, 1971, and 1973. Respondent, at page 28 of his brief, concludes that the Barbours were clinging to an amorphous hope that the market would rise to a point that would permit an understocked ranch to show a profit; he argues that the extent of the profit never concerned them. If we understand respondent's position correctly, he has perhaps conceded his case. If the Barbours' hope is genuine (we think it is and respondent seems to imply it is), whether it is amorphous or not is unimportant. As we have stated, the Ninth Circuit looks to the genuineness of petitioners' intent alone and does not compare it to any standard of reasonableness. Mercer v. Commissioner,supra.Furthermore, the extent of profit is not in issue here; the issue is its existence or nonexistence. Respondent also contends that Thomas Barbour's own remarks about his purposes in ranching belie any genuine desire to make *347 a profit. Thomas Barbour did acknowledge that the ranch was a good place to raise children, that he had a good life, and that the place "just sitting there" was making money for him. However, these statements do not really indicate lack of intent to make a profit. It is possible to enjoy one's life and still want to make a profit. Thomas F. Sheridan,4 B.T.A. 1299 (1926). We have considered respondent's other arguments and find them unpersuasive. We find that petitioners intended to make a profit from cattle ranching. Accordingly, we hold that respondent's determinations, based upon his conclusions that petitioners did not intend to make a profit, are incorrect. Decision will be entered for the petitioners.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. Includes gain and loss under section 1231.↩
3. This amount represents the net capital gain (loss), less the section 1202 deduction.↩
4. Section 162 provides in pertinent part: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. -- There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * * Sec. 1.162-12, Income Tax Regs., provides in pertinent part: (a) Farms engaged in for profit. A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. * * * (b) Farms not engaged in for profit; * * * (1) In general.↩ If a farm is operated for recreation or pleasure and not on a commercial basis, and if the expenses incurred in connection with the farm are in excess of the receipts therefrom, the entire receipts from the sale of farm products may be ignored in rendering a return of income, and the expenses incurred, being regarded as personal expenses, will not constitute allowable deductions. 5. Section 165 provides in pertinent part: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under section (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business;↩
6. Besides disallowing the net losses, respondent has made other adjustments to petitioners' returns on the theory that they did not intend to make a profit. We need not list them all here. We note, however, an apparent contradiction in the statutory notice of deficiency. Respondent computes the investment credit recapture for 1969, adjustment (f), as $2,100.00 on page 2 of the insert entitled "Statutory Paragraphs," yet on page 2 of the statement schedule (Form 3611), he computes it as $21.00.↩
7. Many of respondent's requested findings of fact depend upon the testimony of Dr. Lynn Davis. His testimony was based upon a United States Department of Agriculture statistical study. There is no evidence, however, that this study involved ranches comparable to Monture Ranch or that the area from which the statistics were drawn included the Ovando area.↩