T.C. Memo. 2004-113

UNITED STATES TAX COURT

PAUL S. LINDSEY, JR. AND KRISTEN L. LINDSEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16843-02.          Filed May 11, 2004.

<u>Jim J. Shoemake</u>, <u>Dwight E. Cole</u>, and <u>Matthew S. McBride</u>, for
petitioners.

<u>Michael W. Bitner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes, an addition to tax, and a
penalty as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|--------------------------------|----------------------|
| 1996 | $725,255 | $171,058 | $145,051 |
| 1997 | 4,494 | -- | -- |

After a concession by petitioners, the issues for decision are: (1) Whether any amount of the $2,000,000 that petitioner received from a settlement in 1996 is excludable from gross income under section 104(a)(2); (2) whether petitioners are liable for an addition to tax under section 6651(a)(1); and (3) whether petitioners are liable for an accuracy-related penalty under section 6662(a). The parties agree that the deficiency for 1997 depends on our resolution of the section 104(a)(2) issue for 1996.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Petitioners resided in Texas during the years in issue; petitioners resided in Missouri at the time they filed their petition in this case.

Empire Gas Corp.

Paul S. Lindsey, Jr. (petitioner), has been involved in the propane industry since February 1964. In August 1967, petitioner

began working for Empire Gas Corp. (EGC), a corporation engaged in the liquefied petroleum business.

In June 1994, petitioner and his wife, Kristen L. Lindsey (Lindsey), acquired a controlling interest in EGC. On or about June 30, 1994, petitioner became chief executive officer and chairman of the board of EGC.

EGC's Agreement With Northwestern Growth Co.

In late summer of 1994, petitioner was introduced by Morgan Stanley, the investment banking house used by EGC, to representatives from Northwest Public Service Co. (NPSC), a utility company. In 1995, EGC entered into an agreement with Northwestern Growth Co. (NGC), a subsidiary of NPSC, to acquire Synergy, a propane company. In furtherance of their agreement, EGC and NGC formed SYN, Inc. (SYN), which was to acquire Synergy. Once Synergy was acquired, EGC was to supply the management team to operate it, and NGC was to supply the necessary financial resources. EGC also was to manage any other propane companies acquired by NGC through SYN. In exchange for its management services, EGC was to receive a 30-percent ownership interest in SYN. SYN acquired Synergy in August 1995.

NGC wanted SYN to grow, with the ultimate goal of entering the public financial market through the sale of interests in a master limited partnership (MLP). To that end, petitioner used his contacts in the propane industry to pursue the acquisition of

other propane companies for the benefit of SYN.  EGC dealt primarily with smaller companies and introduced larger multi state companies to representatives of NGC.  In late 1995 or early 1996, petitioner introduced NGC to representatives of Coast Gas, a propane retailer.

Dispute Between EGC and NGC

In late spring or early summer of 1996, representatives of NGC met with petitioner to discuss the possibility of terminating NGC and SYN's relationship with EGC.  Shortly thereafter, petitioner learned that NGC was going to acquire not only Coast Gas, but also Empire Energy, a company that was originally part of EGC.  Petitioner also learned that NGC did not intend for EGC to manage SYN in the future.  Petitioner believed NGC's actions violated the agreement between EGC and NGC with respect to the management of SYN.

On September 20, 1996, EGC sought and obtained a temporary restraining order to halt NGC's acquisition of Empire Energy.  On September 22, 1996, petitioner and Valerie Schall (Schall), an executive vice president of EGC, met with Dick Hylland (Hylland) and Dan Newell (Newell), representatives of NGC, in an attempt to resolve all issues and potential claims that arose or might have arisen from the dispute between EGC and NGC over the operation of SYN (the dispute).  During that meeting, Schall raised a claim for compensation due petitioner as a result of the dispute.

Neither Schall nor petitioner informed Hylland or Newell that petitioner was suffering from a physical injury or physical sickness as a result of the dispute. By the end of the meeting, those present had negotiated a document titled "Issues to be Resolved in Final Agreement", which stated, in part:

> Upon effective closing of the contemplated Coast, Empire Energy, and SYN MLP transactions, NGC in resolution of all arrangements among NGC, SYN, and Empire Gas Corporation [EGC] would provide a cash payment of $20.0 million to Empire Gas and/or Paul S. Lindsey [petitioner]. In the event that Coast and Empire Energy acquisitions close and the MLP has not been effected by June 30, 1997 the cash payment in resolution of all arrangements shall be $15.0 million.

The Termination Agreement

On September 28, 1996, the dispute was resolved by the execution of a termination agreement. The termination agreement provided, in part:

> (e) NGC and Paul S. Lindsey, Jr. [petitioner] hereby agree that, in exchange for the written general release from Mr. Lindsey * * *, $2,000,000 of the Payment Amount shall be allocated to Mr. Lindsey, as the controlling shareholder of EGC, in settlement of his claims for tortious interference with contracts, for personal injury including injury to Mr. Lindsey's personal and professional reputation and emotional distress, humiliation and embarrassment resulting from termination of the Synergy Acquisition documents, and Mr. Lindsey shall provide consulting services to NGC as the parties may agree * * *

Petitioner or EGC proposed the split between petitioner and EGC of the $20 million settlement that was initially agreed upon on

September 22, 1996. The termination agreement was signed by petitioner on behalf of himself and EGC.

From September 22, 1996, through the time of the execution of the termination agreement, neither petitioner nor any representative of petitioner or EGC provided a representative of NGC or SYN with (1) substantiation of any medical expenses incurred by petitioner, (2) information as to any treatments or medications prescribed for petitioner, or (3) an exact dollar figure that would compensate petitioner for any personal injuries petitioner claims to have suffered as a direct result of the dispute.

Receipt of Settlement Proceeds; Federal Tax Return

On or about December 17, 1996, petitioner received a check from NGC in the amount of $2 million pursuant to the termination agreement. NGC did not issue a Form 1099 to petitioner with respect to that payment.

Petitioners requested an automatic 4-month extension to file their 1996 tax return. On January 15, 1998, petitioners filed their 1996 tax return, on which they reported a tax liability of zero. Petitioners did not report the $2 million settlement proceeds.

OPINION

Applicable Statute

Section 61(a) includes in gross income "all income from whatever source derived" unless otherwise provided. Section 104(a)(2) provides otherwise. Before it was amended by the Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605, 110 Stat. 1838, section 104(a)(2) excluded from gross income amounts received on account of personal injuries or sickness. While the reference to personal injuries or sickness did not include damages received pursuant to the settlement of purely economic rights, it did include "nonphysical injuries to the individual, such as those affecting emotions, reputation, or character". United States v. Burke, 504 U.S. 229, 236 n.6 (1992); see Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part and revd. in part on another issue 70 F.3d 34 (5th Cir. 1995); see also Fono v. Commissioner, 79 T.C. 680, 692 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

On August 20, 1996, the SBJPA amended section 104(a)(2) to exclude from gross income "the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness". SBJPA sec. 1605(a), 110 Stat. 1838. The flush language of 104(a) explains

that "emotional distress shall not be treated as a physical injury or physical sickness." Only reimbursements for actual medical care for such injuries are now excludable. The legislative history of this amendment clarifies that "the term emotional distress includes symptoms (e.g., insomnia, headaches, stomach disorders) which may result from such emotional distress." H. Conf. Rept. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041 n.56. Section 1605(d) of the SBJPA, 110 Stat. 1839, provides that (with an inapplicable exception) "the amendments made by this section shall apply to amounts received after the date of the enactment of this Act, in taxable years ending after such date." The SBJPA was enacted on August 20, 1996. Id. at 1755.

Petitioners contend that the "clear language" of section 1605(d) of the SBJPA dictates that the SBJPA amendments to section 104(a)(2) are not effective until 1997 because 1997 is "the tax year ending after the effective date of the enactment of the SBJPA". Petitioners argue that, if Congress had intended for the amendments to become effective in the middle of a year, then it could have unambiguously stated so. Petitioners misinterpret this statutory language.

Petitioners' 1996 taxable year ended December 31, 1996, which is after the date of the enactment of the SBJPA. Petitioner received the settlement proceeds on December 17, 1996,

which is also after the date of enactment of the SBJPA but before the end of the 1996 taxable year. Thus, applying the plain language of the statute, petitioner's receipt of the settlement proceeds was in a taxable year ending after the effective date of the amendment. See, e.g., Filson, The Legislative Drafter's Desk Reference (1992), illustration in sec. 26.4, Event-related effective dates. Accordingly, we apply section 104(a)(2), as amended by the SBJPA.

Application

In interpreting section 104(a)(2), the Supreme Court has held that amounts are excludable from gross income only when (1) the underlying cause of action giving rise to the recovery is based on tort or tort-type rights and (2) the damages were received on account of personal injuries or sickness. Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995); sec. 1.104-1(c), Income Tax Regs. This test has been extended to apply to the SBJPA amendments to section 104(a)(2). See Shaltz v. Commissioner, T.C. Memo. 2003-173; Henderson v. Commissioner, T.C. Memo. 2003-168. Accordingly, the second prong of the test requires proof that the damages were received on account of personal physical injuries or physical sickness.

If damages are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement, rather than the validity of the claim, determines whether the

damages were received on account of tortlike personal injuries. See Robinson v. Commissioner, supra at 126. The determination of the nature of the claim is factual and is made by reference to the settlement agreement in light of the surrounding circumstances. Id. A key question to ask is: "'In lieu of what were the damages awarded?'" Id. (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943)). An important factor in determining the validity of the agreement is the intent of the payor. Id. at 127.

Petitioners contend that section 7491, which was added to the Code by the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726, shifts to respondent the burden of proof of the nature of the claim. Respondent, however, argues that petitioners have not satisfied the statutory requirements under section 7491 because petitioners neither cooperated with reasonable requests for information nor presented credible evidence. See sec. 7491(a)(1) and (2)(B). In this case, we need not decide whether petitioners have complied with the requirements of section 7491 because the resolution of this issue does not depend on which party has the burden of proof. We resolve this issue on the preponderance of the evidence in the record.

Under the terms of the termination agreement, petitioner was awarded $2 million "in settlement of his claims for tortious

interference with contracts, for personal injury including injury to [petitioner's] personal and professional reputation and emotional distress, [and] humiliation and embarrassment". Petitioners argue that, because the termination agreement specifically sets forth the claims that formed the basis for settlement, we need not look to the intent of the payor.

Assuming, arguendo, that the claims stated in the termination agreement accurately reflect the basis for settlement, any amount received on such basis is nevertheless includable in gross income because it was not received on account of personal physical injury or physical sickness within the meaning of section 104(a)(2). As explained above, Congress explicitly excluded from the definition of physical injuries or physical sickness emotional distress and related injuries. Sec. 104(a); see H. Conf. Rept. 104-737, at 301 n.56, supra, 1996-3 C.B. at 1041 n.56. Injury to reputation, humiliation, and embarrassment are akin to emotional distress. See Shaltz v. Commissioner, T.C. Memo. 2003-173. Moreover, tortious interference with contracts is an economic injury, not a physical injury, and so damages received on account thereof are not excludable under section 104(a)(2). See Robinson v. Commissioner, 102 T.C. 126.

Petitioners nevertheless argue that petitioner suffered a physical injury. In support thereof, petitioners presented the

testimony of William Taylor (Taylor), petitioner's treating physician. Even he, however, acknowledged that petitioner's symptoms were the result of the "usual stress related to the buyout of a large gas company". Taylor testified as follows:

> Q: And tell us generally please, if you would, based on your notes, your findings of that physical [examination] in June of 1995.
>
> A: * * * And my overall assessment at that time was that he had an unremarkable exam.
>
> *   *   *   *   *   *   *
>
> Q: And would you tell us, please, what were your findings and conclusions based on that exam in June of 1996?
>
> A: Okay. At that time, his only complaint was having usual stress related to the buyout of a large gas company. He noted low energy.
>
> He was complaining of loud snoring, easy fatigability during the day. Occasional indigestion. * * * Again, difficulty sleeping, some stress.
>
> Q: Did your assessment show that he had hypertension?
>
> A: Yes.

Although petitioners had introduced into evidence the nature of petitioner's alleged physical injury at this point in the testimony, petitioners' counsel continued by asking Taylor what consequences might occur if hypertension goes untreated. Taylor testified that hypertension can lead to strokes, heart attacks, and kidney disease. What petitioner might have suffered had his hypertension gone untreated, however, is not any injury for which

he made claim or for which he was compensated by NGC. What petitioner did suffer--fatigability, occasional indigestion, and difficulty sleeping--are the types of injuries or sicknesses that Congress intended to be encompassed within the definition of emotional distress. See H. Conf. Rept. 104-737, at 301 n.56, supra, 1996-3 C.B. at 1041 n.56. Consequently, amounts received on the basis of such injuries are not excludable from gross income under section 104(a)(2) even if the underlying cause of action sounds in tort.

Even if petitioner had suffered a personal physical injury within the meaning of section 104(a)(2), such injury could not have been the basis for settlement because, as the parties stipulated, petitioner did not communicate any physical injury to representatives of NGC during the settlement negotiations. Clearly he did not make a claim for medical expenses that had been incurred as a result of his injury. Petitioners nevertheless argue that, even though petitioner's injury (presumably the hypertension) was not disclosed to NGC during the settlement negotiations, "this in no way lessens its existence or the extent of such injury." Respondent does not dispute the symptoms described by petitioner. The key, however, is not simply whether petitioner suffered an injury, but whether that injury was the basis for any portion of the settlement. In this case, NGC was unaware that petitioner was suffering from any

physical injury, and so neither petitioner's physical injury nor medical expense could have been the basis for settlement.

On this record, we conclude that petitioner did not receive the settlement proceeds on account of personal physical injuries or physical sickness within the meaning of section 104(a)(2), as amended by the SBJPA. We therefore hold that the entire settlement amount is includable in petitioners' gross income.

Addition to Tax and Penalty

Respondent determined an addition to tax for failure to file timely under section 6651(a)(1) and an accuracy-related penalty for substantial understatement or negligence or disregard of the rules or regulations under section 6662(a). Respondent has the burden of production under section 7491(c) for the addition to tax and the penalty and must come forward with sufficient evidence showing that they are appropriate. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Respondent determined the addition to tax for late filing because, although petitioners received a 4-month extension to file their 1996 tax return, petitioners did not file until January 15, 1998. The due date with the extension was August 15, 1997. Respondent has met his burden under section 7491(c) by establishing petitioners' late filing.

To avoid the addition to tax for filing a late return, petitioners have the burden of proving that the failure to file

did not result from willful neglect and that the failure was due to reasonable cause. See <u>United Stated v. Boyle</u>, 469 U.S. 241, 245 (1985). To prove reasonable cause, a taxpayer must show that he or she exercised ordinary business care and prudence but nevertheless could not file the return when it was due. See <u>Crocker v. Commissioner</u>, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners have presented neither evidence nor argument as to why they did not file their 1996 tax return timely. Instead, petitioners argue that, because the settlement proceeds are excludable from gross income, the related addition to tax under section 6651(a) must not be allowed.

As we concluded, <u>supra</u>, petitioners must include the entire settlement amount in gross income. Because petitioners have not shown that their failure to file timely was due to reasonable cause, respondent's determination with respect to the addition to tax under section 6651(a)(1) is sustained.

Under section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax attributable to a substantial understatement of tax or due to negligence or disregard of the rules or regulations. Sec. 6662(b). Whether the penalty is applied because of a substantial understatement of tax or negligence or disregard of the rules or regulations, the accuracy-related penalty is not imposed with

respect to any portion of the understatement as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); Higbee v. Commissioner, supra at 448-449.  The decision as to whether the taxpayer acted with reasonable cause and good faith depends upon all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.

The term "understatement" is defined as the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax shown on the return for the taxable year.  Sec. 6662(d)(2)(A).  A substantial understatement exists if the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return or (2) $5,000.  The $2 million that petitioners failed to report accounts for all (using a stacking basis) or almost all (using a proportional basis) of the deficiency, which exceeds the greater of 10 percent of the tax required to be shown on petitioners' tax return or $5,000.  Accordingly, respondent's burden of production under section 7491(c) is satisfied.

Petitioners contend that they are not liable for the penalty under section 6662(a) because "the effective date of the SBJPA was unclear, at best".  Petitioners argue that "it is inconceivable that an individual self-preparing an income tax return would have knowledge of a purported change to the tax code which occurred in the middle of the tax year."  Petitioners,

however, have not shown what, if anything, they did to discern the authority on which they relied to justify the exclusion of the settlement proceeds from gross income or to determine the correct effective date of the amendments to section 104(a)(2). They have not identified any tax professionals that they consulted or on whom they relied. Because petitioners have not shown reasonable cause or good faith for their failure to include the settlement proceeds in gross income, the penalty determined by respondent is sustained.

To reflect the foregoing and the concession of petitioners,

<u>Decision will be entered</u>

<u>for respondent</u>.