T.C. Memo. 2005-250

UNITED STATES TAX COURT

GEORGE G. GREEN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 178-02, 12108-03.      Filed October 31, 2005.

<u>Gregg R. Kosterlitzky</u> and <u>Kenton E. McDonald</u>, for
petitioner.

<u>Gerald L. Brantley</u> and <u>Bruce Wilpon</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in these
consolidated cases of $2,636,238, $128,792, $79,135, $52,583, and
$1,868,443 in petitioner's Federal income taxes for 1995, 1996,
1997, 1998, and 1999, respectively.  Respondent also determined
accuracy-related penalties under section 6662(a) of $527,247.60,

$25,748.40, $15,827, $10,516, and $373,688.60 for the years in issue, respectively. Additionally, respondent determined an addition to tax under section 6651(a) of $93,422.15 for failure to file timely for 1999. At the time of trial, respondent asserted that the correct deficiencies were in the amounts of $1,518,890, $119,466, $78,839, $113,255, and $1,865,426 for 1995, 1996, 1997, 1998, and 1999, respectively, with accuracy-related penalties under section 6662(a) of $303,778, $23,893, $15,768, $22,651, and $373,085 for the years in issue, respectively. The correct addition to tax under section 6651(a) for failure to file timely in 1999 was recomputed as $93,271.

After concessions by the parties, the issues for decision are:

(1) Whether petitioner, a cash basis taxpayer, must report the damages received under a release and settlement agreement into which he entered with the State of Texas, and, if so, what amounts must be reported as taxable income;

(2) whether deductions that petitioner substantiated are allowable under section 162 or 212;

(3) whether respondent may amend the answer to include petitioner's attorney's fees in his reportable gross income;

(4) whether petitioner is liable for section 6662(a) accuracy-related penalties for each of the years in issue; and

(5) whether petitioner is liable for the section 6651(a) addition to tax for failure to file timely his 1999 tax return.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner resided in Horseshoe Bay, Texas, at the time that he filed his petition.

Whistleblower Lawsuit and Settlement Agreement

Petitioner worked for the Texas Department of Human Services (TDHS) as an architect from 1983 until December 12, 1989. His duties included reviewing TDHS construction contracts and advising his supervisors as to the contractors' compliance with contractual terms. While working for TDHS, petitioner believed that officials with TDHS were engaged in a pattern of fraud and corruption. Petitioner discussed the misconduct with his supervisors, and, when they failed to act, he advised numerous TDHS employees that he intended to report the misconduct to authorities outside of the department.

In September 1989, TDHS began an investigation of petitioner's long-distance telephone use. The investigation

revealed that, of all of the telephone calls placed from petitioner's extension for 2-1/2 years, one 13-cent telephone call was alleged to be improper. Additionally, in October 1989, TDHS began to investigate petitioner's use of sick leave. Investigators audited petitioner's sick leave records and placed him under surveillance to monitor his activities during those working hours when he was excused to receive physical therapy. The investigators alleged that on one occasion petitioner left work and failed to attend a therapy session and that on several occasions no record existed to show his attendance at a therapy session. On December 12, 1989, petitioner was fired for allegedly abusing his sick leave, falsifying official documents, and misusing his business telephone. TDHS referred the matter, including the improper telephone call, to the district attorney for alleged criminal violations.

Petitioner was subsequently indicted for falsifying documents, a third-degree felony. After petitioner surrendered to the authorities, he was placed in a holding cell at Travis County Jail. Petitioner was handcuffed due to a disturbance that had broken out in the cell. Petitioner was released that same day on a personal bond.

On March 9, 1990, petitioner filed suit against the TDHS, Cause No. 480,701, styled <u>George Green v. Texas Department of Human Services</u>, under the Texas Whistleblower Act. Tex. Rev.

- 5 -

Civ. Stat. art. 6252-16a, recodified as Tex. Govt. Code sec. 554.001, effective Sept. 1, 1993 (Vernon 2004 & Supp. 2004-2005). Petitioner alleged damages of: (1) Loss of wages and benefits; (2) past and future mental anguish; and (3) expenses incurred in connection with prosecuting the case, including court costs and attorney's fees. When the district attorney offered to dismiss the criminal charges if petitioner would drop the whistleblower suit, petitioner refused. Shortly before trial of the criminal case, the district attorney dismissed the charges under the indictment, pending further investigation.

Petitioner's whistleblower suit was tried before a jury from August 26, 1991, through September 17, 1991. At that trial, petitioner's counsel, D. Douglas Brothers (Brothers), informed the jury that they would be asked to award damages for: (1) Out-of-pocket expenses; (2) lost wages, past and future; (3) mental suffering, past and future; and (4) punitive or exemplary damages, awarded "as an example to others and as a penalty or by way of punishment". Brothers informed the jury that exemplary damages serve two purposes: "to deter * * * [retaliatory] conduct, to show how important it is that this never happen; and two, to punish those that perpetuated * * * [the retaliatory] conduct."

At the time of the whistleblower trial, petitioner suffered from severe depression. Richard E. Coons, M.D. (Coons), an

expert witness, testified at the whistleblower trial that petitioner suffered from depression and posttraumatic stress disorder; that the actions of TDHS were a cause of these conditions; and that the injury would be permanent. Coons testified that some of the symptoms of petitioner's depression included compulsive eating, anxiety, crying, decreased confidence, difficulty concentrating, and great sleep disturbance.

The jury found that petitioner was fired in retaliation for reporting activities at TDHS. The jury awarded the following damages:

| | |
|---|---|
| Loss of earning capacity | $928,000 |
| Past mental anguish | 1,000,000 |
| Future mental anguish | 1,500,000 |
| Out-of-pocket expenses | 31,832 |
| Punitive damages | 10,000,000 |

On October 10, 1991, the Travis County District Court, 53rd Judicial District (the trial court), entered judgment in favor of petitioner in the amount of $13,773,461.96. The trial court awarded prejudgment interest of $154,246.57 through September 24, 1991, with an additional $237.97 per day until the judgment was signed. The judgment bore postjudgment interest of 10 percent per annum until paid.

On March 17, 1993, the Court of Appeals for the Third District of Texas affirmed the trial court's judgment. The Court of Appeals held that petitioner must request a legislative

appropriation to collect the damages (including any interest) because only the Legislature could pay the judgment. <u>Tex. Dept. of Human Servs. v. Green</u>, 855 S.W.2d 136, 145 (Tex. Ct. App. 1993). The Court of Appeals judgment became final on April 26, 1994, after the Texas Supreme Court denied TDHS's application for writ of error.

Between 1991 and 1993, petitioner developed a bleeding peptic ulcer and required repeated hospitalization for gastrointestinal bleeding and anemia of life-threatening severity, requiring blood transfusions over a 45-day period. During 1993, 1994, and 1995, petitioner suffered further deterioration of his mental and physical health.

From September 24, 1991, through November 8, 1995, the State of Texas did not pay any part of the judgment or interest. Petitioner discharged Brothers after the final judgment in the whistleblower lawsuit when there was a disagreement as to how to collect on such judgment. Petitioner instituted legal proceedings in an attempt to collect judgment. Additionally, petitioner, individually, attempted to secure a legislative appropriation in 1993 to satisfy his judgment. Petitioner's efforts were unsuccessful.

A regular session of the Texas Legislature convenes only in odd-numbered years. There are two chambers in the Texas Legislature: the Senate and the House of Representatives. All

bills that are introduced for consideration that affect revenues or expenditures must be referred to the Legislative Budget Board (LBB).  If a bill is passed by the introducing legislator's chamber, it must proceed to the other chamber for final passage. If it passes the other chamber, it then proceeds to the Governor for approval or veto.  The Legislature of the State of Texas may choose (through the appropriation process) to pay some, all, or none of any claims against the State.

In or around February 1994, petitioner hired new counsel, John C. Augustine (Augustine), to assist him in the collection of the judgment.  In a memorandum to Augustine dated August 14, 1995, petitioner stated:

> Thus, when I engaged your firm on a contingency fee basis to assist me in my efforts in collecting the judgment I needed no help in collecting the $3.7 million.  You were brought on board to help in collecting the punitive damages and the post-judgment interest.

Additionally, a team of representatives was hired to assist in the collection by "raising consciousness and guiding * * * [petitioner] in an effort to get the attention of the authorities."  On October 6, 1994, in order to fund his collection attempts, petitioner sold an interest worth $1,000,000 of his ultimate recovery, if any, to James U. King, Jr. (King), for $500,000.

In an effort to collect the judgment, petitioner filed abstracts of judgment in several counties against the State of

Texas, all of which were unsuccessful in securing payment. Petitioner and his representatives also attempted to influence public opinion by newspaper and magazine articles and by television broadcasts. At or around this time, petitioner filed a declaratory action, Cause No. 9509704, styled <u>George Green vs. The State of Texas and The Attorney General of Texas, Dan Morales</u>.

Additionally, petitioner, Augustine, and petitioner's representatives tried once again to get a bill passed that would appropriate funds towards petitioner's judgment. The 74th regular session of the Texas Legislature commenced on January 10, 1995, and ended on May 29, 1995. During this time, two bills were introduced to provide for appropriation of amounts to satisfy petitioner's judgment. The first bill that was introduced died in the House Committee on Appropriations. The second bill that was introduced was passed by the House of Representatives and amended and passed by the Senate. However, the House of Representatives refused to concur with the amendments made by the Senate, and the 74th regular session of the Texas Legislature adjourned without passing the bill.

After the Legislature failed to appropriate funds for payment of the judgment, petitioner approached the LBB. Under section 317.002 of the Texas Government Code, the Governor of Texas or the LBB, after finding that an emergency exists, may

propose an expenditure or distribution of funds by a State agency. Tex. Govt. Code Ann. sec. 317.002(b) (Vernon 2004). They may make this proposal at any time that the Legislature is not in session. Tex. Govt. Code Ann. sec. 317.003(a) (Vernon 2005).

In order to convince the LBB that an emergency existed, petitioner and Augustine worked with Lieutenant Governor Bob Bullock (Bullock), chairman of the LBB, and his staff. Petitioner met with Bullock on a few occasions to inform him of petitioner's unsuccessful efforts to collect on his judgment and his continued stress and failing health. In a letter dated September 21, 1995, Augustine informed Bullock that petitioner had authorized him to "propose a method of payment of the judgment by the State of Texas in return for Mr. Green's execution of a Release of Judgment and withdrawal of liens". Augustine also informed Bullock that petitioner's judgment had reached $20,165,725.60 and would be accruing interest at a rate of $5,524.86 per day.

A quorum of the LBB met on November 15, 1995. On that date, at a public meeting, the LBB found that the existence of unpaid monetary obligations of some State agencies created an emergency requiring that those agencies be authorized to expend appropriated funds to pay the obligations. The LBB proposed a budget execution order that authorized TDHS to pay to petitioner:

a settlement, including attorney fees, in the case of George Green v. Department of Human Services in the amount of $13,775,000, contingent on the fact that acceptance of this amount by George Green constitutes a complete release by George Green of all claims and causes of action George Green may have against the state of Texas arising from the case of George Green v. Department of Human Services.

Payments were also authorized to other litigants who had judgments against the State of Texas "according to the terms of a judgment". The LBB adopted the proposed budget execution order on November 15, 1995. On that date, Governor George W. Bush ratified the order.

Petitioner, the State of Texas, Brothers and Associates, and King entered into a written Release and Settlement Agreement (the agreement) dated November 8, 1995. The agreement was contingent upon action by the LBB to approve the agreement. The agreement was negotiated by parties with adverse interests and constituted an arm's-length transaction. The agreement was drafted by Augustine and Harry G. Potter III (Potter), a special assistant attorney general for the State of Texas.

The agreement provided:

1. In Cause No. 480,701, styled George Green v. Texas Department of Human Services * * *. The State has agreed to enter into this Release and Settlement Agreement on the express condition that the State receive a substantial abatement of the amount of punitive damages it pays on account of the judgment. Plaintiff has agreed to compromise the portion of the judgment attributable to punitive damages in accordance with the State's requirements in order to settle all matters in dispute.

2. In Cause No. 9509704 styled; <u>George Green vs. The State of Texas, and The Attorney General of Texas, Dan Morales</u> * * * Plaintiff has asserted against Defendants claims for declaratory and injunctive relief, and attorney's fees as specifically set forth in Plaintiff's Original Petition. Additionally, Defendants have asserted counterclaims for declaratory and injunctive relief. These claims and counterclaims have been denied by the respective parties.

3. * * * the parties have agreed to compromise and settle each action referenced in paragraphs 1 and 2 above and all claims of any kind or character, whether now known or unknown or whether asserted in these suits that the parties have or may have for damages, declaratory relief, injunctive relief, and/or attorneys' fees arising from the factual allegations or theories of recovery contained in any of the pleadings filed in either of the actions referenced above. * * *

4. The State shall make a cash payment of $3,427,999.87 to Plaintiff for the damages for loss of earning capacity, mental anguish and suffering (past) and mental anguish and suffering (future), in accordance with the findings specified and incorporated into the Final Judgment in Cause No. 480,701.

5. The State shall fund annuities for additional damages associated with the Final Judgment in Cause No. 480,701, which in turn shall pay to Plaintiff monthly installments, commencing on January 4, 1996 and continuing until December 4, 1998, each in the amount of $13,499 with a final payment payable on January 4, 1999 in the amount of $3,000,000. * * *

6. For all other damages, including punitive, pre-judgment and post-judgment interest, the State shall fund an annuity or annuities, which in turn shall pay to Plaintiff monthly installments, commencing on January 4, 1996 and continuing until December 4, 1998, each in the amount of $7,924 with a final payment payable on January 4, 1999 in the amount of $1,761,000. * * *

7a. The State shall make a cash payment of $1,000,000.00 to James U. King, Jr., who has an interest in the judgment * * *.

7b.  The State shall make a cash payment of $4,586,000.00 to Brothers & Associates, Attorneys at Law, which law firm owns an interest in the Final Judgment * * *.

            *     *     *     *     *     *     *

9.  * * * The State shall be the owner of the annuities referred to above, but shall have no authority or ability to amend or decrease any provisions during their respective terms.  It is further agreed and understood that the State's obligations with respect to the annuities described herein are discharged upon funding of the annuities in accordance with this Agreement.

            *     *     *     *     *     *     *

11.  The total cost to the State * * * shall not exceed $13,775,000. * * *

12.  It is expressly understood and agreed that the State's obligations under this agreement are contingent upon approval of a Budget Execution Proposal by the Legislative Budget Board, the Governor, and certification by the Comptroller of Public Accounts that said funds are available.  * * *

13.  For consideration given herein * * *, the parties hereby agree that upon full funding of the annuity contracts and payments of cash * * *, the parties shall dismiss with prejudice their respective claims against each other in Cause No. 9509704 * * *

14.  For the consideration given * * *, Plaintiff * * * hereby releases and forever discharges the State of Texas * * * from any and all liability, actions, claims, demands or suits which Plaintiff has or may have, which Plaintiff could have asserted in the suits referenced in paragraphs 1 and 2, or in any other suit * * *.  It is expressly understood and agreed that Plaintiff accepts the consideration herein as full satisfaction of the Final Judgment signed on October 10, 1991 in Cause No. 480,701 * * * and agrees to fully, finally, and forever release, discharge, acquit, and quitclaim said judgment.  * * *

Petitioner received $13,455 per month from January 1996 through December 1998, under the first annuity, and $7,924 per month from January 1996 through December 1998, under the second annuity. Additionally, petitioner received the final payments of $3,000,000 and $1,761,000 under the respective annuities in January 1999.

Green Capital Corp. and TS Capital Asset, LLC

Green Capital Corp. (Green Capital) and TS Capital Asset, LLC (TS Capital), were formed by petitioner for the purpose of employing consultants and advisers, including legal consultants, publicists, and other professionals, to attempt to collect the judgment or otherwise secure payment of damages from the State of Texas.

Petitioner was involved in a suit with Allied Interests, Inc. (Allied), in which petitioner was being sued for expenses owed by petitioner to Allied for services it rendered to petitioner in its attempt to collect petitioner's judgment against the State of Texas. In 1996, a judgment was entered against petitioner and Green Capital. In 1998, petitioner paid Allied $753,629 in satisfaction of Allied's judgment. Included in that amount was $365,000 of exemplary (punitive) damages.

Some of the expenses incurred and paid by petitioner in pursuit of his claims against the State of Texas and in defense

of his lawsuit with Allied consisted of payments to attorneys and consultants and expenses associated with maintaining an office.

Petitioner's Income Tax Returns for 1995 through 1999

On October 15, 1996, petitioner filed his Form 1040, U.S. Individual Income Tax Return, for 1995.  Attached to his income tax return was Form 8275, Disclosure Statement, in which petitioner stated:

> On November 17, 1995 I received a settlement amount by compromise of my Judgment owed to me by the State of Texas.  In my settlement agreement I received $3,427,999 actual damages for personal/physical injury/sickness. * * * This settlement amount is nontaxable and not subject to tax.

Additionally, with respect to petitioner's interest in Green Capital, petitioner reported losses in the amount of $350,752. Petitioner's return for 1995 showed no tax due.

On August 13, 1997, petitioner filed his income tax return for 1996.  On his return, petitioner reported receipt of $257,076 of annuity income, of which $95,088 was reported as taxable. Additionally, with respect to petitioner's interest in Green Capital, petitioner reported losses in the amount of $190,943. Petitioner's return for 1996 showed no tax due.

On October 15, 1998, petitioner filed his income tax return for 1997.  On his return, which was prepared by Hunter & Atkins, Inc. (Hunter & Atkins), petitioner reported receipt of $257,076 of annuity income, of which $95,088 was reported as taxable. Attached to his return was Form 8275, in which petitioner stated:

"This amount [$161,988] represents payments received for non-punitive damages via Metropolitan Life. No Form 1099 was issued, further supporting Taxpayer's position that such amount is not taxable. See attached statement for further clarification of Taxpayer's position." The attached statements were as follows:

> The Settlement Agreement included additional damages associated with the Final Judgment in Cause No. 480,701, be provided to George Green (Plaintiff) from annuity contracts purchased by the State of Texas, the owner of the annuities as follows:

> (Non-punitive) 1. "The State shall fund annuities for additional damages associated with the Final Judgment in Cause No. 480,701 which in turn shall pay to Plaintiff monthly installments . . . in the amount of $13,499". ($161,988 yr)
> (Punitive) 2. "For all other damages, including punitive, pre-judgment and post-judgment interest, the State shall fund an annuity which in turn shall pay Plaintiff monthly installments . . . in the amount of $7,924". ($95,088 yr)

> The annuity payments in the sum of $161,988 received in 1997 represent additional damages other than punitive and interest, and are excluded from income under sec. 104(a)2 [sic].

Additionally, with respect to petitioner's interest in Green Capital, petitioner reported losses in the amount of $41,579. With respect to petitioner's interest in TS Capital, petitioner reported losses in the amount of $45,017. Petitioner's return for 1997 showed tax due in the amount of $8,066.

On October 15, 1999, petitioner filed his income tax return for 1998. On his return, which was prepared by Hunter & Atkins,

petitioner reported receipt of $257,076 of annuity income, of which $95,088 was reported as taxable. Attached to his return was Form 8275, in which petitioner made statements similar to those on his 1997 Form 8275. Additionally, with respect to petitioner's interest in TS Capital, petitioner reported losses in the amount of $811,641. Petitioner's return for 1998 showed no tax due.

On October 16, 2000, petitioner filed his income tax return for 1999. On his return, petitioner reported receipt of $4,761,000 of annuity income, of which none was reported as taxable. Attached to his return was Form 8275, in which petitioner stated:

> (1) This amount [$3,000,000] represents payment received for additional damages from Met. Life annuity contract funded by the State of Texas. No Form 1099 was issued. (See attached statement 1(a) for further explanation.)
>
> (2) This amount [$1,761,000] represents payment received for all other damages from Met. Life annuity contract funded by the State of Texas. A Form 1099 was issued. (See attached statement 2(a) for further explanation.)

The attached statements were as follows:

> 1(a) The final annuity payment in the sum of $3,000,000 received in 1999 represents additional damages excludable from income under IRC Section 104(a)(2).
>
> 2(a) The final annuity payment in the sum of $1,761,000 received in 1999 represents all other damages excludable from income under IRC Section 104(a)(2). Taxpayer cites what he believes is controlling case law as well as the Supreme Court's historical principles of restoration of "Capital Lost-Not Income" to define

other damages received via Jury Verdict and finally by the Release and Settlement Agreement of November 17, 1995.

Additionally, with respect to petitioner's interest in TS Capital, petitioner reported losses in the amount of $30,587. Petitioner's return for 1999 showed no tax due. Petitioner also claimed a $100,000 deduction for legal fees.

On July 13, 2001, petitioner filed Forms 1040X, Amended U.S. Individual Income Tax Return, for 1996, 1997, and 1998, stating, among other things, that "$95,088 of reported income was not includable in taxpayer income. Section 104(a)(2) establishes taxpayer guidance for excludability, along with RR 65-29 and RR 76-133 and PL 97-473." This resulted in petitioner's requesting a refund of $7,654 for 1997.

Internal Revenue Service (IRS) Determinations

In connection with the damages awarded to petitioner under the settlement agreement, the IRS determined that all amounts received by petitioner in 1995, 1996, 1997, 1998, and 1999 were taxable income.

In connection with Green Capital and TS Capital, the IRS disallowed all losses and subsequent carryforward losses claimed by petitioner in 1995, 1996, 1997, 1998, and 1999. The IRS also disallowed the $100,000 itemized deduction petitioner claimed in 1999.

Additionally, the IRS determined accuracy-related penalties under section 6662(a) for all of the years in issue and an addition to tax under section 6651(a) for failure to file timely in 1999.

On February 9, 2005, respondent requested leave of the Court to file an amendment to the answer to include as gross income to petitioner the $4,586,000 of attorney's fees paid to Brothers under the terms of the settlement agreement.

OPINION

Burden of Proof

At trial, the parties agreed that petitioner bears the burden of proof on all of the issues in these cases, except: (i) The issue raised by the proposed amendment to the answer of whether petitioner should have included the contingent attorney's fees in his gross income in 1995 and (ii) any new matter or new issue not raised in respondent's trial memorandum.  (Thus, petitioner has agreed that respondent's burden of production under section 7491(c) with respect to penalties has been satisfied.)

Payments Received Under the Settlement Agreement

Section 61(a) includes in gross income "all income from whatever source derived", unless otherwise provided.  Section 104(a)(2) provides otherwise.  Before it was amended by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605,

110 Stat. 1838, section 104(a)(2) excluded from gross income amounts received on account of personal injuries or sickness. While the reference to personal injuries or sickness did not include damages received pursuant to the settlement of purely economic rights, it did include "nonphysical injuries to the individual, such as those affecting emotions, reputation, or character". United States v. Burke, 504 U.S. 229, 235 n.6 (1992); see Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part and revd. in part on another issue 70 F.3d 34 (5th Cir. 1995); see also Fono v. Commissioner, 79 T.C. 680, 692 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984). The parties have agreed that the version of section 104(a)(2) in effect prior to the 1996 amendment applies to all of the payments received by petitioner pursuant to the settlement agreement.

In interpreting section 104(a)(2), the Supreme Court has held that amounts are excludable from gross income only when (1) the underlying cause of action giving rise to the recovery is based on tort or tortlike rights and (2) the damages were received on account of personal injuries or sickness. Commissioner v. Schleier, 515 U.S. 323, 336-337 (1995); sec. 1.104-1(c), Income Tax Regs.

If damages are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement,

rather than the validity of the claim, determines whether the damages were received on account of tortlike personal injuries. See Robinson v. Commissioner, supra at 126. The determination of the nature of the claim is factual and is made by reference to the settlement agreement in light of the surrounding circumstances. Id. A key question to ask is: "'In lieu of what were the damages awarded?'" Id. (quoting Raytheon Prod. Corp. v. Commissioner, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943)). If the settlement agreement allocates clearly the settlement proceeds between tortlike personal injury damages and other damages, the allocation is generally binding for tax purposes to the extent that the agreement was entered into by the parties in an adversarial context at arm's length and in good faith. If the settlement agreement does not expressly allocate the settlement between tortlike personal injury damages and other damages, the intent of the payor must be determined from all of the pertinent facts and circumstances. Id. at 127. Although the payee's belief is relevant to this inquiry, the ultimate character of the payment hinges on the payor's dominant reason for making the payment. Fono v. Commissioner, supra at 696; see Amos v. Commissioner, T.C. Memo. 2003-329.

In these cases, the settlement agreement allocated damages to petitioner under three separate paragraphs. The provisions are paragraphs 4 through 6 as set forth below:

4. The State shall make a cash payment of $3,427,999.87 to Plaintiff for the damages for loss of earning capacity, mental anguish and suffering (past) and mental anguish and suffering (future), in accordance with the findings specified and incorporated into the Final Judgment in Cause No. 480,701.

5. The State shall fund annuities for additional damages associated with the Final Judgment in Cause No. 480,701, which in turn shall pay to Plaintiff monthly installments, commencing on January 4, 1996 and continuing until December 4, 1998, each in the amount of $13,499 with a final payment payable on January 4, 1999 in the amount of $3,000,000. * * *

6. For all other damages, including punitive, pre-judgment and post-judgment interest, the State shall fund an annuity or annuities, which in turn shall pay to Plaintiff monthly installments, commencing on January 4, 1996 and continuing until December 4, 1998, each in the amount of $7,924 with a final payment payable on January 4, 1999 in the amount of $1,761,000. * * *

The damages allocated in paragraph 4 are precisely traceable to the jury award in petitioner's whistleblower lawsuit, i.e., $2,500,000 of the damages awarded is for past and future mental anguish and $927,999 is for loss of earning capacity. Respondent has conceded that all amounts received in 1995 pursuant to paragraph 4 are excludable from petitioner's gross income.

As a result of respondent's concession, only the effects of the allocations in paragraphs 5 and 6 are disputed. The nature of the claim and the intent of the payor must be determined by examining the facts and circumstances surrounding the settlement agreement.

Under paragraph 5, the State was to fund annuities for "additional damages associated with the Final Judgment" in the whistleblower lawsuit. Because the underlying cause of action giving rise to the recovery of damages was based on tort or tortlike rights, petitioner has met the first prong of the two-prong test set out in Commissioner v. Schleier, supra. However, petitioner has failed to show that, as he contends, the additional damages received under paragraph 5 of the settlement agreement were received on account of personal injuries or sickness. Although there is substantial evidence that petitioner suffered mental and physical deterioration between the time of the judgment in 1991 and the settlement in 1995, there is no allocation under paragraph 5 for any additional injuries. There is no allocation in paragraph 5 for any personal injuries or sickness that arose out of the whistleblower lawsuit, and all compensatory damages awarded in the final judgment of that lawsuit were expressly allocated under paragraph 4 of the settlement agreement.

According to the testimony of Potter, who drafted the agreement for the State of Texas, there was no independent investigation in 1995 of either the jury findings in the original lawsuit or petitioner's injuries. Potter had no knowledge of petitioner's massive bleeding ulcers at the time that he and Augustine drafted the settlement agreement. Though petitioner

made Bullock aware of his injuries, there is no evidence that any of the payments received under paragraph 5 and the first annuity contract were intended by the State to compensate petitioner for personal injuries or sickness.

Petitioner has failed to establish the second prong of Schleier because he is unable to establish that any part of the first annuity was allocable to personal injury or sickness, and the record lacks any evidentiary basis for concluding that a specific portion of the first annuity was allocable to any personal injury or sickness. See Lindsey v. Commissioner, 422 F.3d 684 (8th Cir. 2005), affg. T.C. Memo. 2004-113. Therefore, after examining the facts and circumstances surrounding the claim and the settlement agreement, we conclude that the payments received under paragraph 5 and the first annuity contract are not excludable under section 104(a)(2) and are to be included in petitioner's gross income in the years received.

Paragraph 6 of the settlement agreement allocates the second annuity contract to "all other damages, including punitive [damages] and pre-judgment and post-judgment interest". Petitioner contends that, notwithstanding this express allocation, none of the payments received under the second annuity were for punitive damages or interest.

Punitive damages are included in gross income because they are an element of damages not designed to compensate victims;

rather, they are punitive in nature. O'Gilvie v. United States, 519 U.S. 79, 84 (1996) (citing Commissioner v. Schleier, 515 U.S. 323 (1995)). In the whistleblower trial, petitioner asked for punitive damages "to send a message to this agency, to all of state government that they ought not treat their loyal employees the way Mr. Green was treated".

Interest received is included in gross income because it compensates for the delay in the receipt of a principal amount (i.e., the final judgment). See Kieselbach v. Commissioner, 317 U.S. 399, 404 (1943); see also Robinson v. Commissioner, 102 T.C. at 126; Kovacs v. Commissioner, 100 T.C. 124, 129 (1993), affd. per curiam 25 F.3d 1048 (6th Cir. 1994); Aames v. Commissioner, 94 T.C. 189, 193 (1990). Though petitioner contends that "there was no 'indebtedness'" upon which the interest could accrue and that respondent may not "convert a portion of the Settlement Consideration to interest", there is an express allocation for prejudgment and postjudgment interest set out in paragraph 6 of the settlement agreement.

Additionally, according to Potter, the settlement agreement was worded "to try to minimize the state's exposure to punitive damages * * * [and pay] as little as possible in punitive damages". As set out in paragraph 1 quoted in our findings, the State entered into the settlement agreement on the express condition that it "receive a substantial abatement" of the

punitive damages that had been awarded under the final judgment in the whistleblower lawsuit. There is no indication that a total abatement was intended or effected. In any event, petitioner has presented no persuasive reason for concluding that any of the damages resolved by paragraph 6 fall within an exempt category.

Again, petitioner has failed to establish the second prong of Schleier because he is unable to establish that any part of the second annuity was allocable to personal injury or sickness, and the record lacks any evidentiary basis for concluding that any portion of the second annuity was allocable to personal injury or sickness. See Lindsey v. Commissioner, supra. Therefore, after examining the facts and circumstances surrounding the claim and the settlement agreement, we conclude that the payments received under paragraph 6 and the second annuity contract are not excludable under section 104(a)(2) and are to be included in petitioner's gross income when received.

Expenses for Green Capital and TS Capital

The parties stipulated that for tax years 1995 through 1998 petitioner is entitled to additional deductions in agreed amounts under either section 162 or section 212 as the Court may determine. Petitioner contends that the additional deductions are allowable as ordinary and necessary business expenses under section 162. Respondent contends that the additional deductions

are allowable as amounts paid for the production or collection of income under section 212(1). Expenses deducted under section 162(a) generally are subtracted in full from gross income to arrive at adjusted gross income. However, expenses deducted under section 212 ordinarily are subtracted from adjusted gross income to arrive at taxable income and are subject to certain floor limitations in section 67(a). A deduction under section 212 may also be limited by application of the alternative minimum tax. See sec. 56(b); see also Guill v. Commissioner, 112 T.C. 325, 328-329 (1999); Benci-Woodward v. Commissioner, T.C. Memo. 1998-395, affd. 219 F.3d 941 (9th Cir. 2000). Additionally, net operating losses, such as the ones petitioner is claiming, may carryover under section 172 from the year in which they were incurred to another year only if the losses were the result of operating a trade or business within the meaning of section 162(a). See Eppler v. Commissioner, 58 T.C. 691, 696 (1972), affd. 486 F.2d 1406 (7th Cir. 1973); see also Anderson v. United States, 48 F.2d 201, 202 (5th Cir. 1931).

Section 162(a) permits a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Deductions are allowed under section 212(1) for "the ordinary and necessary expenses paid or incurred during the taxable year * * * for the production or collection of income".

Sections 162(a) and 212 are considered in pari materia, except for the fact that the income-producing activity of the former section is a trade or business whereas the income-producing activity of the latter section is a pursuit of investing or other profitmaking that lacks the regularity and continuity of a business. [Guill v. Commissioner, supra at 328.]

In order to be engaged in carrying on a trade or business, the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). Determining whether a taxpayer is engaged in carrying on a trade or business requires an examination of the facts. Id. at 36.

Petitioner claims that he was in the trade or business of attempting to collect compensation from the State of Texas and conducted that business through Green Capital and TS Capital. Petitioner argues in his brief:

In pursuing compensation for Petitioner's claims against the State from 1991 to 1995, Petitioner retained and consulted with several consultants and advisors, including * * * [lobbyists], engaged in an ongoing orchestrated media campaign and conferred with and lobbied Texas State legislators. From 1991 to 1995, Petitioner engaged in such activities on [a] regular and continuous basis and such activities were done for the purpose of seeking profit, naming [sic] collecting compensation for Petitioner's claims against the State. [Citations omitted.]

Though petitioner continuously and regularly engaged in the activity of attempting to recover his judgment between 1991 and

1995, we cannot conclude that petitioner was in a trade or business in the customary use of those terms. Petitioner did not perform services for others, he had no customers, and he was not in the business of trading securities or gambling on a regular and continuous basis. See id. at 33-34. Petitioner's asserted purpose was to secure the compensation to which he was entitled. Although a trade or business requires continuous and regular activity, continuity and regularity, do not, standing alone, constitute a trade or business. Petitioner's position ignores the distinction between section 162 and section 212--a distinction well-established in history.

In Higgins v. Commissioner, 312 U.S. 212, 218 (1941), the Supreme Court held that the salaries and expenses incident to looking after a taxpayer's own investments were not deductible under section 23 (the predecessor of section 162(a)). In so holding, the Supreme Court stated that "No matter how large the estate or how continuous or extended the work required may be", the fact that the taxpayer kept records and collected interest and dividends from his securities through managerial attention for his investments was not sufficient as a matter of law to permit deduction of the expenses in dispute. Id.

The Revenue Act of 1942, ch. 619, sec. 121, 56 Stat. 819, amended the Internal Revenue Code in response to Higgins and to give relief to "Higgins-type" taxpayers. See H. Rept. 2333, 77th

Cong., 2d Sess. (1942), 1942-2 C.B. 372. In <u>Whipple v.</u>
<u>Commissioner</u>, 373 U.S. 193, 200 (1963), the Supreme Court
explained:

> section 23(a) [the predecessor of section 162(a)] was
> amended not by disturbing the Court's definition of
> "trade or business" but by following the pattern that
> had been established since 1916 of "[enlarging] the
> category of incomes with reference to which expenses
> were deductible," to include expenses incurred in the
> production of income. [Citations omitted.]

The 1942 amendment divided the old section 23(a) into two
parts. One, section 23(a)(1), dealt with the previously
deductible "trade or business" expenses, now covered by section
162; the other, section 23(a)(2), dealt with a new category of
deductions relating to nontrade or nonbusiness expenses, now
covered by section 212. The new category was intended to allow
deductions regarding certain income- or profit-oriented
activities, notwithstanding the absence of a "trade or business".
See <u>Carbine v. Commissioner</u>, 83 T.C. 356, 360-361 (1984), affd.
779 F.3d 662 (11th Cir. 1985). The reasoning behind the adoption
of section 212 supports respondent's contention that petitioner
is allowed deductions related to his income-producing activities
to collect his judgment against the State only to the extent
provided under that statute. Petitioner's situation is analogous
to that of the taxpayers in <u>Usry v. Price</u>, 325 F.2d 657 (5th Cir.
1963), and <u>Feagans v. Commissioner</u>, 23 T.C. 208 (1954).

Therefore, his deductible expenses are allowed only under section 212.

Additionally, petitioner contends that the $365,000 portion of his payment in satisfaction of Allied's judgment, which constitutes exemplary damages, is deductible under section 162 or, in the alternative, under section 212. Respondent contends that, because petitioner is not carrying on a trade or business, he is not entitled to deduct the $365,000 payment for exemplary damages.

Payment of punitive damages may be deductible under section 162. See Kornhauser v. United States, 276 U.S. 145 (1928) (legal expenses of taxpayer in defending against claim of former business partner held deductible); see also Stark v. Commissioner, T.C. Memo. 1999-1. Petitioner, however, has presented inadequate evidence to support his claim that the payment of punitive damages is deductible in these cases. There is insufficient evidence explaining the basis of the award against petitioner or to show that the expense was ordinary and necessary. Thus, the $365,000 payment to Allied is not deductible.

Respondent's Motion To Amend Answer

Rule 41(a) allows for an amendment to the pleadings after a case has been placed on the trial calendar only "by leave of the Court or by written consent of the adverse party, and leave shall

be given freely when justice so requires." Whether a motion seeking amendment should be allowed lies within the sound discretion of the Court. Estate of Quick v. Commissioner, 110 T.C. 172, 178 (1998); Law v. Commissioner, 84 T.C. 985, 990 (1985).

In determining whether permitting a proposed amendment serves justice, we must examine the particular circumstances in the case before us. Estate of Quick v. Commissioner, supra; Law v. Commissioner, supra. We consider, among other factors, whether an excuse for the delay exists and whether the opposing party would suffer unfair surprise, disadvantage, or prejudice if the motion to amend were granted. Estate of Quick v. Commissioner, supra at 178; see Spain v. Commissioner, T.C. Memo. 1978-270.

After two continuances and extensive pretrial proceedings, on October 5, 2004, the Court sent notice to the parties that these cases would be tried on March 7, 2005. Respondent's motion for leave to file an amended answer was filed on February 9, 2005, and seeks to include as gross income to petitioner the $4,586,000 of attorney's fees paid under the terms of the settlement agreement. Respondent asserts that the issue of contingent attorney's fees was not originally included in the pleadings because the Court of Appeals for the Fifth Circuit, the Circuit to which an appeal in these cases lies, allowed a

taxpayer to exclude from gross income the portion of his or her recovery attributable to contingent attorney's fees. See Srivastava v. Commissioner, 220 F.3d 353, 355 (5th Cir. 2000), revg. and remanding in part and affg. on another issue T.C. Memo. 1998-362. On January 24, 2005, the Supreme Court resolved a split in the circuits over the contingent fee issue, holding that, as a general rule, when a taxpayer's litigation recovery constitutes income, the taxpayer is taxable on the contingent fee portion of the litigation recovery. Commissioner v. Banks, 543 U.S. ___, 125 S. Ct. 826, 829 (2005).

Petitioner contends that the amendment would be prejudicial to him. Citing Estate of Horvath v. Commissioner, 59 T.C. 551, 555-556 (1973), petitioner argues that the attorney's fees issue "necessarily will require dramatically different evidence, analysis, and case development from the issues previously pled." Although petitioner has not identified how the evidence or analysis would be "dramatically different", we agree that the applicability of the Supreme Court's Banks opinion is not clearcut or absolute. Certain arguments of the parties in Banks were not addressed because they were not made in the lower courts. Commissioner v. Banks, 125 S. Ct. at 833. We would have to reopen the record so that these arguments could be properly addressed in these cases. We are not persuaded that justice

would be served by permitting the late amendment.  Respondent's motion for leave to file an amended answer will be denied.

Section 6662(a) Accuracy-Related Penalties

Respondent determined accuracy-related penalties under section 6662 for negligence or intentional disregard of rules and regulations and for a substantial understatement of income tax on petitioner's income tax returns for 1995 through 1999.  Under section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to (1) negligence or intentional disregard of rules and regulations or (2) any substantial understatement of income tax.  Sec. 6662(b)(1) and (2).  Section 6662(c) defines "negligence" as including any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code and defines "disregard" as any careless, reckless, or intentional disregard.

An understatement of income tax is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).  An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate.  Sec. 6662(d)(2)(A).  However, the amount of the understatement may be "reduced by that portion of the understatement which is attributable to * * * the tax treatment of any item by the taxpayer if there is or was substantial

authority for such treatment".  Sec. 6662(d)(2)(B)(i).  In the alternative, the amount of the understatement may be reduced by that portion of the understatement which is attributable to any item if (1) "the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return", and (2) "there is a reasonable basis for the tax treatment of such item by the taxpayer."  Sec. 6662(d)(2)(B)(ii).

The section 6662(a) penalty will not be imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); see also Higbee v. Commissioner, 116 T.C. 438, 488 (2001).  The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all of the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his or her proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a tax professional.  See id.

Petitioner argues that it was reasonable for him to believe that he received no substantial payments for punitive damages and interest.  Petitioner has not cited any substantial authority to support his argument that the entire amount received under the settlement agreement was excludable under section 104.  Sec. 6662(d)(2)(B)(i).  Though petitioner disclosed his receipt of the

payments and provided an explanation for the tax treatment of those payments on his returns for 1997, 1998, and 1999 (there was no statement or disclosure for 1996), there was no reasonable basis for excluding the full amounts. Petitioner knew that there was an express allocation in the settlement agreement among compensatory damages, "additional damages", and "other damages", including punitive damages and interest. Additionally, petitioner included the amounts received from the second annuity in his gross income on his original returns for 1996, 1997, and 1998. On his original returns for 1997 and 1998, he specifically designated those amounts as "punitive", further indicating his knowledge that punitive damages and interest were not excluded under section 104. Therefore, in the absence of reasonable cause or substantial authority for excluding from his income any of the payments received in 1996, 1997, 1998, or 1999, the disclosures were inadequate to reduce the understatement of his tax that is subject to penalty under section 6662(d).

Finally, petitioner did not act with reasonable cause and in good faith. Sec. 6664(c)(1). From 1996 through 1998, petitioner reported on his original returns the receipt of punitive damages, yet the damages received in 1999 under the same paragraphs of the settlement agreement were not included by petitioner. Furthermore, though it appears that petitioner had assistance in preparing his returns for 1997 and 1998, there is no evidence as

to what petitioner told the preparer, what the preparer told petitioner, and whether or not petitioner's reliance on any advice from the preparer was reasonable. See sec. 1.6664-4(c), Income Tax Regs. Penalties are sustained for 1996 through 1999 for substantial understatement of tax.

Petitioner has made no argument that penalties should not be sustained to the extent of the disallowed deductions. Petitioner has not cited any substantial authority as to why penalties should not be sustained. Petitioner has not cited any substantial authority to support his argument that he was in a trade or business and allowed to deduct his expenses under section 162. It was unreasonable and thus negligent for petitioner simultaneously to exclude income and claim deductions for the expenses incurred in the collection of that income. Penalties are sustained to the extent of the disallowed deductions for 1995 through 1999.

Section 6651(a) Addition to Tax

Respondent determined the addition to tax for late filing because petitioner did not file his 1999 return until October 16, 2000. There is no evidence that petitioner applied for an extension of time to file his return.

To avoid the addition to tax for filing a late return, petitioner has the burden of proving that the failure to file timely did not result from willful neglect and was due to

reasonable cause.  See <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985).  To prove reasonable cause, a taxpayer must show that he or she exercised ordinary business care and prudence but nevertheless could not file the return when it was due.  See <u>Crocker v. Commissioner</u>, 92 T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Because petitioner failed to present any explanation as to his late filing, respondent's determination with respect to the addition to tax under section 6651(a)(1) is sustained.

We have considered the arguments of the parties that were not specifically addressed in this opinion.  Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>