T.C. Summary Opinion 2009-174

UNITED STATES TAX COURT

JOHN ANTHONY LEONE AND MARY L. SPENCER-LEONE, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1221-08S.            Filed November 24, 2009.

John Anthony Leone and Mary L. Spencer-Leone, pro sese.

<u>Ashley P. Vaughan</u>, for respondent.

VASQUEZ, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463[1] of the Internal Revenue Code in
effect when the petition was filed.  Pursuant to section 7463(b),
the decision to be entered is not reviewable by any other court,

_____

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioners John Leone (Mr. Leone) and Mary Spencer-Leone's (Mrs. Leone) Federal income taxes and accuracy-related penalties as follows:

|  |  | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 2004 | $5,675 | $1,135.00 |
| 2005 | 14,252 | 2,850.40 |
| 2006 | 4,625 | 925.00 |

Afer concessions, the issues for decision are:[2] (1) Whether petitioners' drag racing activity was an activity engaged in for profit under section 183(a); (2) whether capital gain from the sale of rental property should have been reported on petitioners' 2005 Federal income tax return; and (3) whether petitioners are liable for the accuracy-related penalty under section 6662(a).

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this

---

[2] The notice of deficiency disallowed all expenses relating to the drag racing activity. In respondent's pretrial memorandum, respondent conceded the expenses related to the drag racing activity up to the amount of income from the activity.

The notice of deficiency contains adjustments to itemized deductions (changes to the medical expenses and miscellaneous deductions) for 2004 to 2006. These are computational adjustments and are affected by the outcome of the issues to be decided; we do not separately address them.

reference.  At the time petitioners filed the petition, they resided in Texas.

Racing Activities

During the years in issue petitioners were involved in a drag racing activity.  In each of the years petitioners were full-time employees of the U.S. Postal Service.  Mr. Leone was 53 at the time of trial and has been interested in car racing since he was a teenager.  With a self-proclaimed "natural attraction to fast cars", Mr. Leone was "captivated" by the races he watched on television while growing up.  Mrs. Leone's interest in drag racing emerged in 2002 when she started dating Mr. Leone.

Although Mr. Leone was unsure of whether he began his drag racing activity at the end of 2002 or the beginning of 2003, he first reported this activity on his Schedule C, Profit or Loss From Business, under the name "First Strike Racing Team" (First Strike) on his individual 2002 Federal income tax return and described the activity as "racing".  For years 2003 to 2006 petitioners filed joint returns with the same business name and Schedule C activity description.  Petitioners reported the following income, expenses, and net losses from the drag racing activity for 2002 to 2006:

| Year | Gross Income | Expenses | Gain (Loss) |
|------|-------------|----------|-------------|
| 2002 | $200 | $17,915 | ($17,715) |
| 2003 | 1,285 | 20,220 | (18,935) |
| 2004 | 708 | 21,706 | (20,998) |
| 2005 | 4,570 | 25,912 | (21,342) |
| 2006 | 7,700 | 25,719 | (18,019) |
| Total | 14,463 | 111,472 | (97,009) |

Petitioners reported they were entitled to refunds on their 2004, 2005, and 2006 joint income tax returns.[3]  Respondent disputes the drag racing activity expenses exceeding income generated from the activity for years 2004, 2005, and 2006.

Petitioners' business plan for First Strike centered on winning as many "grassroots" level races as possible to offset their expenses while gaining enough acclaim and exposure to attract large sponsors.  When deciding to enter a race, petitioners would weigh the purse size and their chances of winning against their total expenses.  Petitioners did not have a written business plan and did not solicit any professional business advice.

Petitioners' racing activity generated income from: (1) cash prizes for winning or place finishing in races;[4] and (2) gift certificates from local auto parts stores for petitioners' displaying one of their race cars in front of the store.  Petitioners' cash prizes for drag racing activities from 2004

---

[3]  Petitioners reported they were entitled to the following refunds:  $6,099 for 2004, $6,901 for 2005, and $5,631 for 2006.

[4]  Different cash prize amounts are awarded depending on whether one wins or places in a race, with the prize amount being larger the higher one finishes.

through 2006 is as follows:

- 2004:  one place finish;

- 2005:  three place finishes; and

- 2006:  one or two wins, one or two place finishes.

Petitioners received an undisclosed amount of gift certificates from local auto parts stores in 2005 and 2006.  Additionally, in 2006 petitioners received $4,600 from the sale of a broken engine.[5]

Petitioners claimed the following deductions on their Schedules C for 2004, 2005, and 2006:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
| Advertising | $819 | $1,129 | $1,370 |
| Car and truck expenses | 5,457 | 3,934 | 4,895 |
| Commissions and fees | 720 | 1,600 | 1,510 |
| Depreciation | 10,610 | 2,880 | 1,728 |
| Office expenses | 200 | 2,800 | 1,940 |
| Lease of business property | 1,416 | 1,514 | 1,561 |
| Supplies | 324 | 8,733 | 9,200 |
| Taxes and licenses | -- | 200 | 240 |
| Travel expenses | 1,200 | -- | -- |
| Other expenses | 960 | 3,122 | 3,275 |

Petitioners did not establish a budget for expenses, keep financial books or records, or maintain a separate bank account for First Strike.

---

[5]  Mr. Leone testified he routinely broke at least two engines a year but that he "had enough spare parts on hand to piece [an engine] together to keep [racing]".

Petitioners had two race cars: a 2000 Chevy Dragster[6] and a 1969 Chevelle. They also owned a 2004 Cross Country.[7] Petitioners initially referred to their race cars as "dragsters" but later clarified that the Chevelle was just a "regular race car" they used in drag races.[8]

Petitioners placed their Chevelle into service in January 2004. They reported 100 percent business use and a basis of $18,000 and claimed depreciation deductions for 2004, 2005, and 2006. Petitioners acquired the Chevy Dragster for $23,000 in 2001 and sold it for $19,000 in 2003. Mr. Leone built one of his cars with the aid of a local speed shop for around $22,000. Upon quitting the activity in late 2006 or 2007, he sold the car for around $10,000. Mr. Leone did not specify which car he built or to whom he sold it. No record of this alleged sale was presented.

---

[6] Mr. Leone described the Chevy Dragster as a 32-foot "long-rail" with a backside engine and topside spoiler.

[7] Petitioners never mentioned the Cross Country during their testimony; however, it is listed as an asset on their 2005 and 2006 returns. The 2005 and 2006 returns show they placed the Cross Country into service in December of 2004, listed no basis, and used the standard mileage rate deduction for the Cross Country in 2005 and 2006, claiming 9,100 business miles in 2005 and 11,000 business miles in 2006. It is unclear from the record whether the Cross Country is a race car.

[8] Petitioners used the term "dragster" when discussing their cars.

During the years in issue Mr. Leone spent approximately 10 to 25 hours per week on the drag racing activity, Mrs. Leone spent approximately 10 hours per week on the drag racing activity, and occasionally friends helped with the drag racing activity. Petitioners worked on the drag racing activity either at the storage area where they kept the drag racing cars or at their home. During the years in issue petitioners did not keep a time log or calendar of these hours.

Petitioners were the only drivers for First Strike. When Mrs. Leone would race, Mr. Leone would "de-tune" the race car and restrict its maximum speed.

Petitioners participated in approximately 10 races per year. Some of the races had a cash prize of $8,000 to $10,000. The largest prize petitioners received from any particular race was $1,500. The races were sponsored by the International Hot Rod Association and took place in different cities around the southwestern United States. Petitioners did not provide records of race participation despite having stated they possessed such records.

Petitioners did not conduct a written cost analysis for any of the races in which they participated. Petitioners did not provide any documents or records to show what changes, if any, to improve profitability were made.

Petitioners discontinued their drag racing activity in 2007. Although they enjoyed the sport, the losses were too great. Petitioners liquidated the assets from their drag racing activity.

Sale of Rental Home

In 1992 Mr. Leone purchased a property in El Paso, Texas. He used it as his primary residence until 2002. During June 2002 Mr. Leone converted it into a rental property. In December of 2003 he agreed to sell it to a coworker for $54,000. Title complications delayed the closing of the sale, and petitioners did not receive the funds from the sale of the home until July 2005.

Petitioners included the expected proceeds from the sale of the home on their 2003 return and reported that the sale had closed on December 15, 2003. Petitioners reported they had received $54,000 for the house and sustained an $11,237 ordinary loss on the sale of the property.[9]

Petitioners did not receive the proceeds from the sale of the home until 2005. Petitioners received $51,640.97 for the home.

---

[9] On their 2003 Form 4797, Sales of Business Property, part I, Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft--Most Property Held More Than 1 Year, petitioners reported their rental property had a basis of $69,000, they had deducted depreciation of $3,763, and they sold the home for $54,000.

Petitioners reported $54,000 as the selling price on their 2003 return because it was the initially agreed-upon price. Petitioners reported $69,000 as the basis because it was the value assigned to the rental property by the El Paso County tax assessor. Subsequently, the parties stipulated that petitioners had a $20,400 initial basis in the property.

Petitioners subtracted $3,763 of depreciation from their basis to calculate the $11,237 ordinary loss reported on their 2003 joint tax return. Petitioners claimed rental home depreciation deductions on their tax returns for 2002 and 2003 totaling $5,471; Mr. Leone deducted $2,016 of depreciation for 2002 on his individual tax return, and the Leones deducted $3,455 of depreciation for 2003 on their joint tax return. No explanation was given for the disparity in the depreciation amounts.

Discussion

## I. Activity Not Engaged In for Profit

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b). Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The Court of Appeals for the Fifth Circuit, to which an appeal in this case would lie but for section 7463(b), has held that for a deduction to be allowed under section 162 or 212(1) or (2), a taxpayer must establish that he engaged in the activity with the primary purpose and intent of realizing an economic profit independent of tax savings.  Westbrook v. Commissioner, 68 F.3d 868, 875 (5th Cir. 1995), affg. T.C. Memo. 1993-634.

The expectation of profit need not have been reasonable; however, the taxpayer must have entered into the activity, or continued it, with the objective of making a profit.  Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs.  Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances.  Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs.  Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof.[10]  See Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective:  (1) The manner in which the taxpayer carries on the

---

[10]  Petitioners have neither claimed nor shown that they satisfied the requirements of sec. 7491(a) to shift the burden of proof to respondent with regard to any factual issue.

activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative. Rather, all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Id.; cf. Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Petitioners assert the losses from their drag racing activity in 2004, 2005, and 2006 are deductible because they engaged in the activity for profit. Respondent asserts petitioners' drag racing activity in 2004, 2005, and 2006 was not engaged in for profit. After considering the factors in section 1.183-2(b), Income Tax Regs., we agree with respondent and conclude petitioners' drag racing activity in 2004, 2005, and 2006 was not engaged in for profit and, accordingly, petitioners are not entitled to deduct losses incurred in such activity.

A.  Manner in Which the Activity Is Conducted

Section 1.183-2(b)(1), Income Tax Regs., provides that carrying on an activity in a businesslike manner may be indicative of a profit objective.  The regulation further identifies three practices consistent with businesslike operations: (1) Maintaining complete and accurate books and records; (2) conducting the activity in a manner substantially similar to that of profitable businesses of the same nature; and (3) changing operational methods and techniques to improve profitability.  See id.  The Tax Court has found establishing a business plan to be a fourth practice evidencing businesslike operations.  See Sanders v. Commissioner, T.C. Memo. 1999-208.

Petitioners did not maintain any financial books or ledgers for their racing activity and had no records of the races in which they raced.  In addition, petitioners did not keep a budget of their expenses or record how much income they received or from where it was generated.  This lack of elementary business practices indicates a lack of profit objective.  See Snoddy v. Commissioner, T.C. Memo. 1991-251 (stating that "we think a serious business operation would have kept records to show races petitioner entered, and what his winnings were in each race"); Woods v. Commissioner, T.C. Memo. 1985-233 (finding that a taxpayer who did not maintain a formal general ledger, accounts receivable ledger, accounts payable ledger, or asset ledgers in

stock racing activity did not operate in a businesslike manner); Whitener v. Commissioner, T.C. Memo. 1979-415 (finding that a taxpayer who kept no business books or records did not conduct his stock car racing activity in a businesslike manner).

Petitioners' alleged efforts to improve profitability by changing their methods and techniques of conducting their drag racing activity is not substantiated by the record. Mr. Leone testified that he received advice from fellow racers on various racing issues and as a result he and his wife were more frugal in advertising First Strike. However, no evidence was presented to show what changes were made or when they were implemented. Further, petitioners' tax returns reveal their advertising expenses steadily increased each year from 2004 to 2006. Cf. Dwyer v. Commissioner, T.C. Memo. 1991-123 (finding indication of profit objective for taxpayer's financing son's auto racing career where taxpayer changed operating methods, tried new approaches, and discontinued methods that did not work).

Petitioners testified that they intended to make First Strike a profitable business by winning races as often as possible in hopes of attracting a large sponsor. Petitioners did not present a written business plan. A lack of a formal written business plan is not determinative of a lack of profit objective. See Sanders v. Commissioner, supra. Nevertheless, some

indication of a plan for success (i.e., profitability) should be given. Id.

Given the substantial costs associated with operating petitioners' drag racing team, more than petitioners' vague and wishful representation that they would be profitable by winning often is needed to conclude petitioners had a plan to make a profit. See id.; Spear v. Commissioner, T.C. Memo. 1994-354 (finding unpersuasive a business plan for racing activity that consisted solely of the taxpayer's claiming it would take 10 years before the activity would become profitable). This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

B. Expertise

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit intent. Sec. 1.183-2(b)(2), Income Tax Regs. Taxpayers should not only familiarize themselves with the undertaking, but should also consult or employ an expert, if needed, for advice on how to make the operation profitable. Burger v. Commissioner, 809 F.2d 355, 359 (7th Cir. 1987), affg. T.C. Memo. 1985-523. Courts have made clear that the focus is upon expertise and preparation with regard to the economic aspects of the particular business. Wesinger v. Commissioner, T.C. Memo. 1999-372 (citing

Golanty v. Commissioner, 72 T.C. 411, 432 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981)).

Petitioners had no experience managing a drag racing team. Despite incurring significant losses and rarely winning or placing, petitioners never solicited the aid of any professional business advisers. Petitioners did receive advice from fellow drag racers, but no evidence was presented to suggest these drag racers were experts or had experience with the business side of racing. This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

C. Time and Effort Expended

The fact that a taxpayer spends much time and effort in conducting an activity may indicate that he or she has a profit objective, particularly if the activity does not have substantial personal or recreational aspects. Sec. 1.183-2(b)(3), Income Tax Regs.

During the years in issue petitioners were both employed full time by the U.S. Postal Service. Petitioners devoted their time after work hours and on weekends to First Strike. Petitioners did not maintain a professional crew, received sporadic help from friends, and were the only drivers for First Strike. The activity primarily consisted of Mr. Leone's working on the cars, petitioners' driving to races, and the races themselves. Although the record does indicate petitioners spent

time (outside of their full-time postal employment) on their drag racing activity, this does little to support petitioners' claim that it was a serious activity engaged in for profit. See Snoddy v. Commissioner, T.C. Memo. 1991-251 (finding lack of support for a profit motive in a car racing activity when the taxpayer was a full-time manager at an auto parts store, mainly worked on the car after hours and on weekends, enlisted volunteers to help with working on the car and serve in the "pit", and had an independent driver). Further, it is clear this activity had substantial recreational aspects for Mr. Leone. This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

D. The Expectation That Assets May Appreciate in Value

A taxpayer may intend, despite the lack of profit from current operations, that an overall profit will result when appreciation in the value of assets used in the activity is realized. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); sec. 1.183-2(b)(4), Income Tax Regs.

Petitioners routinely broke at least two drag racing car engines per year, a fact that seems inconsistent with their claim that the drag racing cars would appreciate in value. Petitioners sustained a loss when they sold the Chevy Dragster in 2003. Petitioners presented no evidence regarding the appreciation of

their remaining assets. This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

E. Success in Similar or Dissimilar Activities

If a taxpayer has previously engaged in similar activities and made them profitable, this success may show that the taxpayer has a profit objective, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Success in unrelated activities may also be indicative of a profit objective in the challenged activity. See Daugherty v. Commissioner, T.C. Memo. 1983-188 (finding that a taxpayer who started and maintained a profitable screws product company had reason to believe he would be successful in a farming activity). Conversely, a lack of such experience does not necessarily indicate the activity was not engaged in with the objective of making a profit. Arwood v. Commissioner, T.C. Memo. 1993-352. Petitioners had no previous experience in any other businesses. This factor is neutral.

F. History of Income or Loss and Potential for Profitability

A record of substantial losses over several years may be indicative of the absence of a profit objective. See Golanty v. Commissioner, supra. The amount of profits in relation to the amount of losses incurred, and in relation to the amount of the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the

taxpayer's intent. Sec. 1.183-2(b)(7), Income Tax Regs. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. Id.

Petitioners suffered an uninterrupted history of losses from their drag racing activity from 2002 through 2006 and never turned a profit. Petitioners invested $111,472 in their drag racing venture yet earned only $14,463 and sustained a net loss of $97,009.

Furthermore, it does not appear petitioners would have had the ability to recoup their losses or make a profit. Petitioners have not produced any evidence to suggest they were close to securing a large sponsor. In petitioners' case the potential for profitability through winning races alone seems implausible. Petitioners participated in about 10 races a year, with some purses in the range of $8,000 to $10,000. However, petitioners' winnings suggest they were limited to winning small races with small purses. See Dwyer v. Commissioner, T.C. Memo. 1991-123 (finding a profit objective for a taxpayer involved in a stock car racing activity where, inter alia, the taxpayer could conceivably recoup past losses and turn a profit because purses averaged hundreds of thousands of dollars). This factor weighs

against finding petitioners' drag racing activity was engaged in for profit.

G.  Financial Status

Substantial income from sources other than the activity in question, particularly if the activity's losses generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  See sec. 1.183-2(b)(8), Income Tax Regs.

Petitioners' annual combined income was approximately $100,000 from their employment as U.S. postal workers. Petitioners derived substantial tax benefits from deducting the losses associated with their Schedule C activity.  First Strike's losses offset roughly one-fifth of petitioners' income and resulted in petitioners claiming refunds for each year.  This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

H.  Elements of Personal Pleasure

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective, but the mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, demonstrate a lack of a profit objective.  See Rinehart v. Commissioner, T.C. Memo. 1998-205; sec. 1.183-2(b)(9), Income Tax Regs.  However, should the likelihood of profit be small compared to the possibility for gratification, the latter possibility may be the

primary motivation for the activity. Filios v. Commissioner, T.C. Memo. 1999-92 (citing White v. Commissioner, 23 T.C. 90, 94 (1954), affd. per curiam 227 F.2d 779 (6th Cir. 1955)), affd. 224 F.3d 16 (1st Cir. 2000).

Petitioners readily admitted they enjoyed racing. Despite petitioners' substantial losses and small chance to turn a profit, petitioners continued to race. Petitioners spent their time repairing the drag racing cars and driving to various cities to participate in drag races. We have previously stated that automobile racing is often engaged in for amusement and as a hobby, and that this tends to militate against a finding that the activity was engaged in for profit. Whitener v. Commissioner, T.C. Memo. 1979-415 (citing McLean v. Commissioner, 285 F.2d 756 (4th Cir. 1961), affg. per curiam T.C. Memo. 1960-128). Petitioners' approach to their drag racing activity suggests they viewed drag racing as a recreational getaway rather than a profit-earning activity. This factor weighs against finding petitioners' drag racing activity was engaged in for profit.

I. Conclusion

Petitioners did not conduct their drag racing activity in a businesslike manner. They had an extended, uninterrupted period of substantial losses and had no practical possibility of recouping their losses and turning a profit. Furthermore, there was a substantial recreational aspect to petitioners' drag racing

activity. Accordingly, we hold that petitioners' drag racing activity was not engaged in for profit during 2004, 2005, and 2006, and section 183(b)(2) prohibits any deduction of expenses greater than the gross income derived from the activity.

II. Sale of Rental Property

Section 61(a) defines gross income to include all income from whatever source derived, and section 61(a)(3) specifically provides that gross income includes gains derived from dealings in property. Section 1001(a) provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the taxpayer's adjusted basis in the property. Section 1001(b) defines the amount realized from the sale or other disposition of property as the sum of any money plus the fair market value of the property received. See also sec. 1.1001-1(a), Income Tax Regs. Petitioners sold their rental home in 2005 for gross proceeds of $51,640.97. Accordingly, petitioners realized $51,640.97 for the sale of their rental home in 2005.

Section 1012 provides that a property's adjusted basis shall be the cost of such property, and cost is defined as the amount paid for the property in cash or other property. Sec. 1.1012-1(a), Income Tax Regs. In addition, section 1016(a)(2) provides that the basis should be adjusted for depreciation deductions. Mr. Leone paid $20,400 in 1992 for his rental home and deducted

$5,471[11] of depreciation for 2002 and 2003.  In 2003 petitioners had an adjusted basis of $14,929.

When petitioners received $51,640.97 in 2005 for the sale of their rental property, they recognized a gain of $36,711.97.  See sec. 1001(c).  Because this was a sale of qualified section 1231 property and petitioners had no other section 1231 property dispositions, the gain is taxed at 2005 capital gain rates.[12] See sec. 1231(a)(1), (b); sec. 1.1231-1(a), (c), Income Tax Regs.

III.  Accuracy-Related Penalty

Respondent determined that petitioners are liable for accuracy-related penalties under section 6662 for 2004, 2005, and 2006.  Respondent argues that petitioners are liable for the section 6662 accuracy-related penalty attributable to one or more of the following:  (1) Negligence or disregard of rules or regulations; (2) substantial understatement of income tax; and

---

[11]  For 2002 Mr. Leone deducted depreciation of $2,016, and for 2003 petitioners deducted depreciation of $3,455.

[12]  On brief respondent argued that the tax benefit rule dictates that petitioners' 2005 income should be increased by $11,237 (the amount of the ordinary loss deducted on the sale of the property in 2003).  We consider the tax benefit rule to be a new matter because it would require the presentation of different evidence from the evidence required to tax petitioners on the gain resulting from the sale of their house in 2005.  The tax benefit rule and 2003 were not referenced in the statutory notice of deficiency, and respondent never amended his answer.  We find that this issue is not before the Court.  See Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. per curiam 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).

(3) substantial valuation misstatement (overstatement). See sec. 6662(b). Respondent has not alleged a substantial valuation misstatement for 2004, 2005, or 2006.

Section 7491(c) provides that the Commissioner bears the burden of production with respect to the liability of any individual for additions to tax and penalties. The Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty, addition to tax, or additional amount. Swain v. Commissioner, 118 T.C. 358, 363 (2002); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001). If a taxpayer files a petition alleging some error in the determination of an addition to tax or a penalty, the taxpayer's challenge will succeed unless the Commissioner produces evidence that the addition to tax or the penalty is appropriate. Swain v. Commissioner, supra at 363-365. The Commissioner, however, does not have the obligation to introduce evidence regarding reasonable cause or substantial authority. Higbee v. Commissioner, supra at 446-447.

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of the underpayment of tax attributable to one or more of the items set forth in section 6662(b), including negligence or disregard of rules or regulations and substantial understatement of income tax. "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the

internal revenue laws and is the failure to exercise due care or the failure to do what a reasonable and prudent person would do under the circumstances. Sec. 6662(c); <u>Neely v. Commissioner</u>, 85 T.C. 943, 947 (1985); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs. An "understatement" of income tax is the difference between the amount of tax required to be shown on the return and the amount of tax actually shown on the return. Sec. 6662(d)(2)(A). A "substantial understatement" exists if the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for a taxable year, or (2) $5,000. Sec. 6662(d)(1)(A).

The section 6662(a) accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. <u>Id.</u>

Petitioners do not contest the penalties relating to their drag racing activity. Accordingly, we sustain the section 6662

penalties with regard to petitioners' drag racing activity for 2004, 2005, and 2006.  See sec. 7491(c).

However, petitioners contend that they are not liable for the portion of the accuracy-related penalty for 2005 related to the sale of their rental home.  They claim they already paid tax for 2003 relating to the sale of their rental home[13] and were simply following the advice of their tax adviser.

Petitioners' failure to report the gain from the sale of their rental home in 2005 was negligent.  See sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.

Petitioners claim their understatement was reasonable and in good faith because they relied upon the advice of their tax return preparer, Ms. Barton, when reporting the sale of their rental home for 2003.  Reliance on a return preparer may relieve a taxpayer from the addition to tax for negligence where the taxpayer's reliance is reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  A taxpayer, however, is not relieved from liability for the addition to tax for negligence merely by shifting the responsibility to a tax professional.  Enoch v. Commissioner, 57 T.C. 781, 802 (1972).  Reliance on an expert is not an absolute defense but is a factor to be considered.

---

[13]  On their income tax return for 2003, petitioners reported a loss from the sale of the rental property and received a tax benefit.

<u>Freytag v. Commissioner</u>, <u>supra</u> at 888.  A taxpayer's reliance must be in good faith and demonstrably reasonable.  <u>Ewing v. Commissioner</u>, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); <u>Freytag v. Commissioner</u>, <u>supra</u> at 888-889.  In such a case, a taxpayer will be entitled to rely upon an expert's advice, even if the advice should prove to be erroneous.  <u>Jackson v. Commissioner</u>, 86 T.C. 492, 539 (1986), affd. on other issues 864 F.2d 1521 (10th Cir. 1989); <u>Brown v. Commissioner</u>, 47 T.C. 399, 410 (1967), affd. per curiam 398 F.2d 832 (6th Cir. 1968).

The ultimate responsibility for a correct return lies with the taxpayer, who must furnish the necessary information to the agent who prepared the return.  <u>Enoch v. Commissioner</u>, <u>supra</u> at 802.  In other words, reliance upon expert advice will not exculpate a taxpayer who supplies the return preparer with incomplete or inaccurate information.  <u>Lester Lumber Co. v. Commissioner</u>, 14 T.C. 255, 263 (1950).

Petitioners stated they informed Ms. Barton that the sale did not close until 2005 but did not think they provided her with the closing papers.  Accordingly, petitioners have not established that they acted in good faith or had reasonable cause in failing to report capital gain from the sale of their rental home.  See <u>Green v. Commissioner</u>, 507 F.3d 857, 872 (5th Cir. 2007) (upholding imposition of section 6662 penalty even though

taxpayer consulted a professional because "there was no evidence as to what * * * [the taxpayer] told the preparer, what the preparer told * * * [the taxpayer], and whether or not * * * [the taxpayer's] reliance on any advice from the preparer was reasonable."), affg. T.C. Memo. 2005-250. Given this lack of evidence, we sustain respondent's determination of the section 6662(a) penalty.

To reflect the foregoing,

Decision will be entered

under Rule 155.